**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| CYNTHIA A. PARMELEE, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No. 3:16-CV-00783-K |
| SANTANDER CONSUMER USA HOLDINGS INC., THOMAS G. DUNDON, ISMAIL DAWOOD, JASON KULAS, and JENNIFER DAVIS, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs Cynthia A. Parmelee and Kelly Baxley ("Lead Plaintiffs"), by and through their undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, counsel's investigation, including without limitation: (1) a review and analysis of regulatory filings made by Santander Consumer USA Holdings Inc. ("Santander Consumer" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) a review and analysis of press releases and media reports issued and disseminated by Santander Consumer; (3) a review of other publicly available information concerning Santander Consumer; and (4) conversations with former employees of Santander Consumer.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Santander Consumer securities between February 3, 2015 and March 15, 2016, inclusive (the "Class Period"), seeking to recover compensable damages caused by

1

Defendants' violations of the federal securities laws, and to pursue remedies and assert claims under Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Santander Consumer is a consumer finance company focused on vehicle finance and unsecured consumer lending products.  Throughout the Class Period, Defendants knowingly or recklessly incorrectly identified the population of loans held by the Company that should have been classified as troubled debt restructurings ("TDRs") and incorrectly estimated the impairment rate on TDRs.  In violation of prescriptive generally accepted accounting principles ("GAAP"), Defendants also applied an incorrect discount rate to their TDR impairment calculation, resulting in, among other things, the Company understating its allowance for credit losses.  As a result, the Company materially overstated its net income during the Class Period. These flagrant accounting errors resulted in multiple restatements covering fiscal year 2014 ("FY 2014"), fiscal year 2015 ("FY 2015"), and the quarters within those periods.

3.      The Company's originally reported financial results overstated net income for FY 2014 by 5.7% and overstated net income for FY 2015 by 5.1%.  This overstatement in net income was particularly concentrated in two quarters: (i) the fourth quarter of 2014 ("4Q 2014"), where net income was overstated by 61.8%; and (ii) the first quarter of 2015 ("1Q 2015"), where net income was overstated by 19.3%.  The original 4Q 2014 results were reported on February 3, 2015, and the original 1Q 2015 results were reported on April 29, 2015.  As a result of the material overstatements of net income in these quarters, the Company's stock price was artificially inflated to historically high levels during the early portion of the Class Period.

4.      Defendant Thomas G. Dundon, Santander Consumer's Chief Executive Officer at the time, took advantage of this inflation in the Company's stock to leave the Company and negotiated a separation agreement that would cash out his substantial ownership position in the

Company at the highest intraday trading price that the Company's stock ever traded at—before, during, or after the Class Period.  As a result, Santander Consumer's corporate parent, Santander Holdings USA, Inc., the owner of approximately 60% of the Company's stock, agreed to purchase the Company stock held by DDFS LLC—an entity solely owned by Dundon and the owner of approximately 10% of the Company's stock—for approximately $928 million.  Had the transaction been consummated at the stock price immediately before the Class Period—before the Company's stock was artificially inflated by Defendants' misstated financials—the same block of stock would have sold for more than $250 million less than the exorbitant price obtained as a result of Defendants' fraud.

5.     Ultimately, as explained below, the market became aware of the true facts concerning the Company's financial position, and the Company's stock price tanked.  Dundon's sweetheart deal has stalled pending regulatory approval, and Dundon has attempted to resuscitate it by agreeing to a minor adjustment in the price.  In the meantime, as a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

6.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

7.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

8.     In connection with the acts, transactions, and conduct alleged herein, Defendants

directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.   <u>PARTIES</u>

9.      Lead Plaintiff Cynthia A. Parmelee, as set forth in the accompanying certification (*see* Exhibit A), incorporated by reference herein, purchased Santander Consumer common stock during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws and false and/or misleading statements and/or material omissions alleged herein.

10.     Lead Plaintiff Kelly Baxley, as set forth in the accompanying certification (*see* Exhibit B), incorporated by reference herein, purchased Santander Consumer common stock during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws and false and/or misleading statements and/or material omissions alleged herein.

11.     Defendant Santander Consumer is a Delaware corporation with its principal executive offices situated at 1601 Elm Street, Suite 800, Dallas, Texas 75201.  Santander Consumer common stock trades on the New York Stock Exchange ("NYSE") under the symbol "SC."

12.     Defendant Thomas G. Dundon ("Dundon") was Chief Executive Officer ("CEO") and a director of Santander Consumer from December 2006 until July 2, 2015.

13.     Defendant Ismail Dawood ("Dawood") has served as Chief Financial Officer ("CFO") of Santander Consumer since December 16, 2015.

14.     Defendant Jason A. Kulas ("Kulas") has served as CEO and a director of Santander Consumer since July 2, 2015, when he replaced Dundon.  From January 2007 to July 2, 2015, Kulas was also CFO of Santander Consumer.

15.     Defendant Jennifer Davis (formerly Jennifer Popp) ("Davis") was interim CFO of

4

Santander Consumer from July 2, 2015 until December 16, 2015.  Prior to July 2, 2015 and after December 16, 2015, Davis was Deputy CFO of Santander Consumer.

16.     Defendants Dundon, Dawood, Kulas, and Davis are referred to collectively herein as the "Individual Defendants."

17.     Santander Consumer and the Individual Defendants are referred to collectively herein as the "Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background Of The Company

18.     In its Annual Report on Form 10-K for the year ended December 31, 2014, filed with the SEC on March 2, 2015 ("2014 10-K"), Defendants described Santander as "a specialized consumer finance company focused on vehicle finance and unsecured consumer lending products. The Company's primary business is the indirect origination of retail installment contracts, principally, through manufacturer-franchised dealers in connection with their sale of new and used vehicles to retail consumers."[1]  The Company further explained that:

> We are a leading originator of nonprime auto loans. National and regional banks have historically been the largest originators of used and nonprime vehicle loans and leases due to their broad geographic footprint and wide array of vehicle finance products. We primarily compete against national and regional banks, as well as automobile manufacturers' captive finance businesses, to originate loans and leases to finance consumers' purchases of new and used cars. We also have been increasing our portfolio of prime loans and leases serviced for others, as we began originating and then selling prime assets with servicing retained.

---

[1] A retail installment contract differs from a traditional loan.  According to the Consumer Fraud Protection Bureau ("CFPB"), "[a] loan is a transaction between you and a bank or other lender for money, where you use the money to purchase a vehicle and agree to repay the loan balance plus interest.  A retail installment sale, on the other hand," the CFPB continues, "is a transaction between you and the dealer to purchase a vehicle where you agree to pay the dealer over time, paying both the value of the vehicle plus interest. A dealer could sell the retail installment sales contract to a lender or other party." *See* CONSUMER FINANCIAL PROTECTION BUREAU, available at http://www.consumerfinance.gov/askcfpb/817/what-retail-installment-sales-contract-or-agreement-loan.html.

We are also increasing our focus on the unsecured consumer lending market, including credit cards, private student loans, point-of-sale financing and personal loans. From a high in 2008, the U.S. consumer has steadily faced declining access to traditional sources of consumer credit. This decline is evidenced by the reduction of outstanding consumer credit card limits by approximately $713 billion and of home equity lines of credit by approximately $387 billion since 2008. During the economic downturn, traditional lenders were forced to tighten credit and, in some cases, exit the market altogether, leaving a large market opportunity with significant growth potential. Additionally, consumer loan demand is recovering and, on average, most domestic bank lenders have reported stronger demand for consumer loans since April 2011. Imbalances in supply and demand have created a significant opportunity for companies like us who have national scale, financial strength, stability of management, strong credit and underwriting processes, and an appetite for identifying incremental lending opportunities.

*****

In conjunction with a ten-year private label financing agreement with Chrysler Group (the "Chrysler Agreement") that became effective May 1, 2013, the Company offers a full spectrum of auto financing products and services to Chrysler customers and dealers under the Chrysler Capital brand. These products and services include consumer retail installment contracts and leases, as well as dealer loans for inventory, construction, real estate, working capital and revolving lines of credit.

The Company also originates vehicle loans through a web-based direct lending program, purchases vehicle retail installment contracts from other lenders, and services automobile and recreational and marine vehicle portfolios for other lenders. Additionally, the Company has several relationships through which it provides unsecured consumer loans, private-label credit cards and other consumer finance products.

**B.      Defendant Dundon's Ownership Of Over 10% Of The Company's Common Stock And His Right To Put That Stock To Santander Holdings USA, Inc.**

19.      The Company disclosed that as of February 24, 2015: (i) Santander Holdings USA, Inc. ("SHUSA"), a subsidiary of Banco Santander, S.A. ("Santander") owned 60.3% of the Company; (ii) Defendant Dundon, directly and through an entity, DDFS LLC ("DDFS"), owned 10% of the Company; and (iii) public shareholders owned 29.6%.  According to a Schedule 13G, filed with the SEC on February 13, 2015, DDFS is "a Delaware limited liability company, solely

owned by" Defendant Dundon.  That same filing notes that as of December 31, 2014, Defendant

Dundon had (i) sole voting and dispositive power over 13,736,638 shares or options to purchase

shares of Santander Consumer common stock and (ii) shared voting and dispositive power over

34,598,506 shares of Santander Consumer Stock, for a total of 48,335,144 shares beneficially

owned, equal to 13.3% outstanding shares, based on 348,977,625 shares outstanding as of

February 2, 2015.

20.    In connection with the Company's January 23, 2014 Initial Public Offering

("IPO"), SHUSA, DDFS, Defendant Dundon and Sponsor Auto entered into a Stockholders

Agreement, entitling them to "certain rights related to director nominations, approvals over

certain actions taken by [the Company] and registration rights."  As described in the Company's

Proxy Statement on Schedule 14A, filed with the SEC on June 15, 2015, among those rights are,

among others, the following obligations regarding the expiration of Defendant Dundon's

employment with Santander Consumer:

### Put and Call Rights

The Stockholders Agreement also provides that DDFS LLC and SHUSA have
certain put and call rights relating to the shares of common stock owned by DDFS
LLC. Following the expiration of Mr. Dundon's employment under his
employment agreement or if Mr. Dundon's employment is terminated for death,
because Mr. Dundon is unable to perform his job, by Mr. Dundon for good reason
or by us for any reason other than for cause, DDFS LLC has the right, during the
90 days after such termination, to require SHUSA to purchase all (but not less
than all) of the shares of common stock owned by DDFS LLC. In addition, upon
the occurrence of certain events, SHUSA has the option to require DDFS LLC to
sell all (but not less than all) of the shares of common stock owned by DDFS
LLC. The events that trigger this call right include the expiration of Mr. Dundon's
employment under his employment agreement, the termination of Mr. Dundon's
employment for any reason and any default under the line of credit extended to
DDFS LLC by an affiliate of Santander. All shares of common stock owned by
DDFS LLC are subject to a pledge agreement for the benefit of the affiliate of
Santander relating to a $300 million line of credit extended by such affiliate of
Santander to DDFS LLC (which line of credit becomes immediately due and
payable upon Mr. Dundon's termination of employment for any reason). The

purchase price per share upon exercise of put or call rights is generally equal to the average of the volume-weighted average price of a share of common stock for the ten trading days ending on (and including) the trading day immediately preceding a notice of exercise.

## C.     The Company's Business

### 1.     Retail Installment Contracts

21.     With regard to retail installment contracts, the Company disclosed the make-up of

its accounts for interest on those loans, stating:

**Retail Installment Contracts**

Retail installment contracts consist largely of nonprime automobile finance receivables, which are acquired individually from dealers at a nonrefundable discount from the contractual principal amount. Retail installment contracts also include receivables originated through a direct lending program and loan portfolios purchased from other lenders. Retail installment contracts acquired individually or originated directly are primarily classified as held for investment and carried at amortized cost, net of allowance for credit losses. Most of the Company's retail installment contracts held for investment are pledged under its warehouse lines of credit or securitization transactions. Retail installment contracts the Company does not have the intent and ability to hold for the foreseeable future or until maturity or payoff are classified as held for sale and carried at the lower of cost or market, as determined on an aggregate basis.

Interest is accrued when earned in accordance with the terms of the retail installment contract. The accrual of interest is discontinued and reversed once a retail installment contract becomes more than 60 days past due, and is resumed and reinstated if a delinquent account subsequently becomes 60 days or less past due. The amortization of discounts, subvention payments from manufacturers, and other origination costs on retail installment contracts held for investment acquired individually or through a direct lending program are recognized as adjustments to the yield of the related contract using the effective interest method. The Company estimates future principal prepayments and defaults in the calculation of the constant effective yield. Such estimates are based primarily on a combination of historical experience and forecasted results. Differences between estimated and actual principal prepayments and defaults have historically been insignificant and recognized in income in the period differences are determined.

A portion of the discount received on contracts purchased from other lenders is attributable to the expectation that not all contractual cash flows will be received from the borrowers. These loans are accounted for in accordance with FASB ASC 310-30, Loans and Debt Securities Acquired with Deteriorated Credit Quality. The excess of the estimated undiscounted principal, interest, and other cash flows

expected to be collected over the initial investment in the acquired loans, or accretable yield, is accreted to interest income over the expected life of the loans using the effective interest rate method. The nonaccretable difference, or excess of contractually required payments over the estimated cash flows expected to be collected, is not accreted into income.

Any deterioration in the performance of the purchased portfolios results in an incremental provision for credit losses. Improvements in performance of the purchased pools that significantly increase actual or expected cash flows result first in a reversal of previously recorded allowance for credit losses and then in a transfer of the excess from nonaccretable difference to accretable yield, which will be recorded as finance income over the remaining life of the receivables.

2014 10-K at 63.

22.     With regard to the quality of its lending portfolios, the Company stated in its 2014

10-K that:

Historically, used car financing has made up a majority of our business. Used automobiles accounted for 72% of total automobiles sold in the United States in 2014. In 2014, through the third quarter, approximately 54% of used car purchases were financed. Most loans in the used auto finance space are extended to nonprime consumers, who comprise a significant portion of the U.S. population. Of the approximately 200 million Americans with a credit history, 34% have FICO® scores below 650. Although nonprime auto loans typically produce higher losses than prime loans, *our data-driven approach, extensive experience, and adaptive platform have enabled us to accurately project cash flows and effectively price loans for their inherent risk*.

(Emphasis added).

### 2.     Troubled Debt Restructuring

23.     Chapter 8 of the "Financial Accounting Manual for Federal Reserve Banks"

includes "Special Topics."  Among the topics is Section 81.09, "Troubled Debt Restructuring"

("TDR").  With respect to TDR, the Federal Reserve states:

81.09 Troubled Debt Restructuring

Modification of the terms of a loan may qualify as a troubled debt restructuring if the Bank, for economic or legal reasons related to the debtor's financial difficulties, grants a concession that it would not otherwise have considered. The following types of loan modifications may trigger an evaluation to determine if the restructuring qualifies as a troubled debt restructuring:

- Reduction of the stated interest rate
- Extension of the maturity date at a stated interest rate lower than the current market rate for new debt with similar risks
- Reduction of the principal amount of the debt
- Reduction of the accrued interest.

If any of the above criteria are met, the amount of the impairment loss is measured as the excess of the current recorded investment in the loan over the present value of modified cash flows discounted at the loan's original contractual effective interest rate. The impairment loss should be recorded to the allowance for loan restructuring account and to provision for loan loss. The loan should be periodically evaluated and, if necessary, adjustments should be recorded to the allowance for loan restructuring and provision for loan loss.

If the Bank expects that, after restructuring the loan, it will be able collect all amounts in accordance with the revised terms of the loan agreement, it should continue to record interest income. If, however, the Bank does not expect to collect all amounts in accordance with the revised terms of the loan agreement, it should discontinue recording interest income and follow the procedures described in paragraph 81.05.[2]

24.     In its 2014 10-K, the Company, itself, described TDRs as follows:

A modification of finance receivable terms is considered a troubled debt restructuring ("TDR") if the Company grants a concession it would not otherwise have considered to a borrower for economic or legal reasons related to the debtor's financial difficulties. The Company considers TDRs to include all individually acquired retail installment contracts or unsecured revolving loans that have been modified at least once, deferred for a period of 90 days or more, or deferred at least twice. Additionally, restructurings through bankruptcy proceedings are deemed to be TDRs. The purchased receivables portfolio and operating and capital leases are excluded from the scope of the applicable guidance, and none of our unsecured term loans or dealer loans have been modified.

25.     In addition, in Notes to Consolidated Financial Statements for the year ended

December 31, 2014 in the 2014 10-K, with respect to TDRs, the Company wrote:

In certain circumstances, the Company modifies the terms of its finance receivables to troubled borrowers. Modifications may include a reduction in interest rate, an extension of the maturity date, rescheduling of future cash flows, or a combination thereof. A modification of finance receivable terms is

---

[2] FEDERAL RESERVE, https://www.federalreserve.gov/federal-reserve-banks/fam/chapter-8-special-topics.htm#xsubsection-111-832ba153.

considered a troubled debt restructuring ("TDR") if the Company grants a concession to a borrower for economic or legal reasons related to the debtor's financial difficulties that would not otherwise have been considered. Management considers TDRs to include all individually acquired retail installment contracts that have been modified at least once, deferred for a period of 90 days or more, or deferred at least twice. Additionally, restructurings through bankruptcy proceedings are deemed to be TDRs. The purchased receivables portfolio and operating and capital leases are excluded from the scope of the applicable guidance. As of December 31, 2014 and 2013, there were no receivables from dealers classified as a TDR.

26.    As with all loans, the Company was required to consider TDRs' status and to timely impair them, pursuant to specific rules. With respect to the impairment of TDRs, the Company continued in the 2014 10-K:

For TDRs, impairment is typically measured based on the differences between the net carrying value of the loan and the present value of the expected future cash flows of the loan. The loan may also be measured for impairment based on the fair value of the underlying collateral less costs to sell for loans that are collateral dependent.

27.    According to Defendants the impairment of TDRs directly impacted the Company's Allowance for Credit Losses. In the 2014 10-K, the Company stated:

For loans not classified as TDRs, the Company generally estimates an appropriate allowance for credit losses based on delinquency status, the Company's historical loss experience, estimated values of underlying collateral, and various economic factors. Once loans have become classified as a TDRs, they are collectively assessed for impairment based on the present value of expected future cash flows discounted at the loan's original effective interest rate considering all available evidence.

28.    In turn, as the impairment for TDRs increased, so too did the Company's Allowance for Credit Losses. Regarding its Allowance for Credit Losses, the Company stated in its 2014 10-K that it:

[M]aintain[s] an allowance for credit losses, established through a provision for credit *losses charged to expense*, that we believe is appropriate to provide for probable losses inherent in our originated loan portfolio. For receivables portfolios purchased from other lenders at a discount to the aggregate principal balance of the receivables, the portion of the discount that was attributable to

credit deterioration since origination of the loans is recorded as a nonaccretable difference. Any deterioration in the performance of the purchased portfolios after acquisition results in an incremental allowance. Our allowance for loan losses as of December 31, 2014 is $3.1 billion, or 11.5% of outstanding principal balance. The determination of the appropriate level of the allowance for credit losses and nonaccretable difference inherently involves a high degree of subjectivity and requires us to make significant estimates of current credit risks and future trends, all of which are subject to change. Changes in economic conditions affecting borrowers, new information regarding our loans, and other factors, both within and outside of our control, may require an increase in the allowance for credit losses. Furthermore, growth in our loan portfolio generally would lead to an increase in the provision for credit losses. Some of our recent and planned growth is in lending areas other than vehicle loans, and we are not experienced in estimating credit losses in those other areas. In addition, if net chargeoffs in future periods exceed the allowance for credit losses, we will need to make additional provisions to increase the allowance. There is no precisely accurate method for predicting credit losses, and we cannot assure you that our credit loss allowance will be sufficient to cover actual losses. Any increases in the allowance for credit losses will result in a decrease in net income and capital and may have a material adverse effect on us.

(Emphasis added).

29.    According to Defendants, for 2014, the Company reported $4.19 billion in "Total TDR Principal" for "Retail Installment Contracts" with an "Impairment" of $797.2 million or 19%.  For "Unsecured Consumer Loans," the Company reported Total TDR Principal of $17.347 million with an Impairment of $6.94 million, or 40%. In its 2014 10-K, the Company made clear that it considers a TDR "to have subsequently defaulted upon charge off, which for retail installment contracts is at the earlier of the date of repossession or 120 days past due and for revolving unsecured consumer loans is generally the month in which the receivable becomes 180 days past due."  For 2014, the Company reported that Retail Installment Contracts' TDRs that subsequently defaulted were $419 million, representing 36,843 contracts.  Unsecured Consumer Loans that subsequently defaulted were $3.44 million, representing 3,401 contracts.

30.    Where TDR impairment materially affected the Company's Allowance for Credit Losses, the Company faced a material, inverse impact to net income.  Thus, as TDR impairment

increased, so too did the Company's Allowance for Credit Losses, in turn reducing net income.

31.     Throughout the Class Period, however, as detailed below, Defendants knowingly or recklessly "incorrectly identified the population of loans that should have been classified and disclosed as TDRs."  In addition, they "incorrectly estimated the impairment on" TDRs.  *See* Annual Report of Santander Consumer on Form 10-K/A for the year ended December 31, 2015, filed with the SEC on October 27, 2016 ("2015 10-K/A"), at pp. 91, 140.

32.     Moreover, in violation of prescriptive – not judgment-based – GAAP, Defendants knowingly or recklessly applied an incorrect discount rate to their TDR impairment calculation, resulting in, among other things, the Company understating its allowance.

33.     Last, again in violation of prescriptive GAAP, Defendants knowingly or recklessly applied accretion methodology to engage in a scheme to fail to adequately impair TDRs, thereby materially understating the Company's Allowance for Credit Losses and overstating its net income at a crucial time.

34.     As Defendants manipulated the Company's TDR metrics and, in turn, the Company's net income, as described more fully below, Defendant Dundon prepared his exit from the Company.  With the help of the materially false and misleading TDR metrics and the resulting inflation of the Company's net income, the price of Santander Consumer common stock shot from $18.63 per share on February 2, 2015 to close at $26.48 on July 1, 2015.   As Defendants ran up the price of the Company's common stock, Defendant Dundon prepared to exit the Company and sell to SHUSA the Company stock that he owned through DDFS for more than $928 million, a price that substantially exceeded the value of the stock and which represented an increase of more than $250 million compared to the price four months earlier, before the materially false and misleading statements were made.

## V.   FALSE AND MISLEADING STATEMENTS

### A.   Financial Results For 4Q 2014 And FY 2014

35.   On February 3, 2015, the Company filed a Current Report on Form 8-K ("February 3, 2015 Form 8-K") with the SEC,[3] attaching a press release it had issued at 7:00 a.m. that same day ("February 3, 2015 Press Release"), in which it announced Santander Consumer's financial results for the fourth quarter and fiscal year ended December 31, 2014.

36.   In the February 3, 2015 Press Release, the Company stated that "[t]he allowance for loan losses," which it defined as "the ratio of Allowance for credit losses to End of period assets covered by allowance for credit losses," "remained flat at $3.1 billion quarter-over-quarter."  Also on February 3, 2015, at 9:00 a.m., the Company held an earnings conference call with investors to discuss its financial results for the fourth fiscal quarter ended December 31, 2014 ("February 3, 2015 Earnings Call").  Defendants Dundon and Kulas participated in the February 3, 2015 Earnings Call.

37.   During the February 3, 2015 Earnings Call, Defendant Dundon discussed the highlights of the Company's financial results for the fourth quarter and fiscal year ended December 31, 2014.  Defendant Dundon stated, among other things, that "[f]ourth quarter results are highlighted by strong profitability, during the quarter SCUSA earned net income of $247 million or $0.69 per diluted common share."

38.   The foregoing statement made by Defendant Dundon in the February 3, 2015 Earnings Call was false and misleading.  The Company corrected its accretion methodology, impacting its balance sheets as detailed in the Annual Report on Form 10-K/A for the year ended December 31, 2015, which Santander Consumer filed with the SEC on October 27, 2016,

---

[3] Defendant Kulas signed the February 3, 2015 Form 8-K.

excerpts of which are attached hereto as Exhibit C and incorporated herein by reference. Defendants knew or were reckless in not knowing that, for the fourth fiscal quarter ended December 31, 2014, they overstated net income by $94.313 million, or 61.8%, and net income per diluted common share by $0.26, or 60.5%.

39.     In the 2014 10-K, in the "Notes to Consolidated Financial Statements," the Company presented unaudited quarterly financial data for each of the 2014 fiscal quarters.  In a section of the 2014 10-K, beginning on page 33, entitled "Selected Financial Data," the Company presented summary data on various categories of income statement and share value for the fiscal years 2005-2014.

40.     For the fourth fiscal quarter ended December 31, 2014, the Company reported net income of $247.033 million, or $0.69 per diluted common share.  For the full fiscal year 2014, the Company reported net income of $766.349 million, or $2.15 per diluted common share.

41.     The foregoing statements in the February 3, 2015 Press Release and the 2014 10-K with respect to the Company's net income and net income per diluted common share for both the fourth fiscal quarter ended December 31, 2014 and for the full fiscal year 2014 were false and misleading.  The Company corrected its accretion methodology, impacting its balance sheets as detailed in the Annual Report on Form 10-K/A for the year ended December 31, 2015, which Santander Consumer filed with the SEC on October 27, 2016, excerpts of which are attached hereto as Exhibit C and incorporated herein by reference.  Defendants knew or were reckless in not knowing that, for the fourth fiscal quarter ended December 31, 2014, they overstated net income by $94.313 million, or 61.8%, and net income per diluted common share by $0.26, or 60.5%.  Defendants also knew or were reckless in not knowing that, for the 2014 fiscal year, they overstated net income by $41.065 million, or 5.7%, and net income per diluted common share by

15

$0.11, or 5.4%.

42.     The extent of Defendants' recklessness can be observed by comparing the balance sheets originally disclosed to those restated in the Form 10-K/A that was filed on October 27, 2016.  Excluding totals and subtotals, Defendants reported fourteen asset categories on its balance sheet in 2014.  Of these, Defendants restated nine, or 64%, of these asset categories.  *See* 2015 10-K/A, at Note 2.  In other words, Defendants got the numbers wrong over two-thirds of the time.  A similar statistic can be found when looking at the liability accounts.  Out of the nine categories, five, or 56%, had to be restated.  *See id.*  The restatement of the Statements of Income and Comprehensive Income show a similar pattern with Defendants having to restate half of the accounts disclosed.  *See id.*

43.     More evidence of Defendants' recklessness can be observed in finance receivables held for investment, and net deferred tax liabilities.  The first time Defendants restated their financials[4] with the filing of the Form 10-K on March 31, 2016, Defendants stated that both accounts were understated by $56,508,000 and $19,021,000, only to reverse course and disclose that the accounts were subsequently overstated by $60,410,000 and $48,197,000, respectively.

44.     In Item 9A of the 2014 10-K, Defendants stated that:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our CEO and Chief Financial Officer ("CFO"), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a- 15(e) and 15d- 15(e) under the Securities Exchange Act of 1934, as amended (Exchange Act)), as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our CEO and CFO have concluded that as of December 31, 2014, our disclosure

---

[4] Defendants restated the financial results at issue in this case two times:  first, in the FY 2015 Form 10-K filed on March 31, 2016, and second, in the FY 2015 Form 10-K/A filed on October 27, 2016.

controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Controls over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting is a process designed under the supervision of the Company's Chief Executive Officer and Chief Financial Officer to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external purposes in accordance with generally accepted accounting principles.

As of December 31, 2014, management assessed the effectiveness of the Company's internal control over financial reporting based on the criteria for effective internal control over financial reporting established in "Internal Control – Integrated Framework," issued by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission ("2013 framework"). ***Based on the assessment, management determined that the Company maintained effective internal control over financial reporting as of December 31, 2014, based on those criteria.***

Deloitte & Touche LLP, our independent registered public accounting firm, has issued an audit report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014. The report, which expresses an unqualified opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, is included in Part II, Item 8 of this Annual Report on Form 10-K.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the year ended December 31, 2014 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

45.     Attached as Exhibits 31.1 and 31.2 to the 2014 10-K were the Certifications of

Defendant Dundon and Defendant Kulas, respectively, pursuant to Section 302 of the Sarbanes-

Oxley Act of 2002 (the "SOX 302 Certifications").  In the SOX 302 Certifications, Defendants

Dundon and Kulas each certified that:

1.      I have reviewed this annual report on Form 10-K of Santander Consumer
USA Holdings Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement
of a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made, not
misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial
information included in this report fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for
establishing and maintaining disclosure controls and procedures (as defined in
Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial
reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the
registrant and have:

a.      Designed such disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under our supervision, to ensure
that material information relating to the registrant, including its consolidated
subsidiaries, is made known to us by others within those entities, particularly
during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused
such internal control over financial reporting to be designed under our
supervision, to provide reasonable assurance regarding the reliability of financial
reporting and the preparation of financial statements for external purposes in
accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls
and procedures and presented in this report our conclusions about the
effectiveness of the disclosure controls and procedures, as of the end of the period
covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal
control over financial reporting that occurred during the registrant's most recent
fiscal quarter that has materially affected, or is reasonably likely to materially
affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our

most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.[5]

46.     The foregoing statements in Item 9A of the 2014 10-K and the SOX 302 Certifications of Defendants Dundon and Kulas, attached to the 2014 10-K, were false and misleading for the same reasons as stated above in ¶¶35-43.   In addition, the foregoing statements were false and misleading because Defendants failed to disclose the existence of certain material weaknesses in their internal control over financial reporting in the areas of control environment, risk assessment, control activities, and monitoring.   Defendants Dundon and Kulas knew or were reckless in not knowing that they had created and/or maintained an ineffective control environment in which the risk of errors in these areas had materialized, as evidence by their failure to: (a) effectively execute a strategy to hire and retain a sufficient complement of personnel with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting; (b) establish and/or maintain a tone at the top sufficient to ensure there were adequate mechanisms and oversight to ensure accountability for the performance of internal control over financial reporting responsibilities and to ensure corrective actions were appropriately prioritized and implemented in a timely manner; (c) adequately assess changes in risks by management that could significantly impact internal control over financial reporting or an adequate determination and prioritization of how those

---

[5] 2014 10-K, Exs. 31.1, 31.2.

risks should be managed; (d) provide adequate management oversight and identification of models material to financial reporting; (e) ensure that Company accounting policies were documented sufficiently and that sufficiently detailed Company procedures were promulgated to put policies into effective action; (f) establish an appropriate tone at the top and/or an effective control owner risk and controls self-assessment process, which contributed to a lack of clarity about ownership of risk assessments, control design and effectiveness; and (g) establish sufficient governance, oversight and monitoring of the credit loss allowance and accretion processes and a lack of defined roles and responsibilities in monitoring functions.

        **B.**      **Financial Results For 1Q 2015**

     47.     On April 28, 2015, the Company filed a Current Report on Form 8-K ("April 28, 2015 Form 8-K") with the SEC,  attaching a press release issued that same day ("April 28, 2015 Press Release"), announcing Santander Consumer's financial results for the first fiscal quarter ended March 31, 2015.

     48.     Also on April 28, 2015, at 10:30 a.m., the Company held an earnings conference call with investors to discuss its financial results for the first fiscal quarter ended March 31, 2015 ("April 28, 2015 Earnings Call").  Defendants Dundon and Kulas participated in the April 28, 2015 Earnings Call.

     49.     During the April 28, 2015 Earnings Call, Defendant Dundon discussed the highlights of the Company's financial results for the first fiscal quarter ended March 31, 2015. Defendant Dundon stated, among other things, that "[d]uring the quarter, SCUSA earned net income of $289 million or $0.81 per diluted common share."

     50.     The foregoing statement made by Defendant Dundon in the April 28, 2015 Earnings Call was false and misleading.  The Company corrected its accretion methodology, impacting its balance sheets as detailed in the Quarterly Report on Form 10-Q/A for the period

ended March 31, 2015, which Santander Consumer filed with the SEC on October 27, 2016, excerpts of which are attached hereto as Exhibit D and incorporated herein by reference. Defendants knew or were reckless in not knowing that, for the first fiscal quarter ended March 31, 2015, they overstated net income by $46.805 million, or 19.3%, and net income per diluted common share by $0.13, or 19.1%.

51.     On April 29, 2015, the Company filed with the SEC a Quarterly Report on Form 10-Q for the first fiscal quarter ended March 31, 2015 ("April 29, 2015 Form 10-Q").   In a section of the April 29, 2015 Form 10-Q, beginning on page 6, entitled "Condensed Consolidated Financial Statements," the Company presented unaudited quarterly financial data for the three-month period ended March 31, 2015.

52.     For the first fiscal quarter ended March 31, 2015, the Company reported net income of $289.250 million, or $0.81 per diluted common share.

53.     The foregoing statements in the April 28, 2015 Press Release and the April 29, 2015 Form 10-Q with respect to the Company's net income and net income per diluted common share for the first fiscal quarter ended March 31, 2015 were false and misleading.  The Company corrected its accretion methodology, impacting its balance sheets as detailed in the Quarterly Report on Form 10-Q/A for the period ended March 31, 2015, which Santander Consumer filed with the SEC on October 27, 2016, excerpts of which are attached hereto as Exhibit D and incorporated herein by reference.  Defendants knew or were reckless in not knowing that, for the first fiscal quarter ended March 31, 2015, they overstated net income by $46.805 million, or 19.3%, and net income per diluted common share by $0.13, or 19.1%.

54.     Attached as Exhibits 31.1 and 31.2 to the April 29, 2015 Form 10-Q were the SOX 302 Certifications of Defendants Dundon and Kulas, respectively, which are substantively

identical to those quoted in ¶45.[6]

55.     The foregoing statements in the SOX 302 Certifications of Defendants Dundon and Kulas, attached to the April 29, 2015 Form 10-Q, were false and misleading for the same reasons as stated above in ¶46.

###     C.      Financial Results For 2Q 2015

56.     On August 10, 2015, the Company filed with the SEC a Quarterly Report on Form 10-Q for the second fiscal quarter ended June 30, 2015 ("August 10, 2015 Form 10-Q").[7] Attached as Exhibits 31.1 and 31.2 to the August 10, 2015 Form 10-Q were the SOX 302 Certifications of Defendants Kulas and Davis, respectively, which are substantively identical to those quoted in ¶45.[8]

57.     The foregoing statements in the SOX 302 Certifications of Defendants Kulas and Davis, attached to the August 10, 2015 Form 10-Q, were false and misleading for the same reasons as stated above in ¶46.

###     D.      Financial Results For 3Q 2015

58.     On October 29, 2015, the Company filed with the SEC a Quarterly Report on Form 10-Q for the third fiscal quarter ended September 30, 2015 ("October 29, 2015 Form 10-Q").[9]  Attached as Exhibits 31.1 and 31.2 to the October 29, 2015 Form 10-Q were the SOX 302 Certifications of Defendants Kulas and Davis, respectively, which are substantively identical to those quoted in ¶45.[10]

59.     The foregoing statements in the SOX 302 Certifications of Defendants Kulas and

---

[6] April 29, 2015 Form 10-Q, Exs. 31.1, 31.2.

[7] Defendants Kulas and Davis signed the August 10, 2015 Form 10-Q.

[8] August 10, 2015 Form 10-Q, Exs. 31.1, 31.2.

[9] Defendants Kulas and Davis signed the October 29, 2015 Form 10-Q.

[10] October 29, 2015 Form 10-Q, Exs. 31.1, 31.2.

Davis, attached to the October 29, 2015 Form 10-Q, were false and misleading for the same reasons as stated above in ¶46.

     **E.**     **Financial Results For FY 2015**

     60.     On January 27, 2016, the Company filed a Current Report on Form 8-K ("January 27, 2016 Form 8-K") with the SEC,  attaching a press release issued that same day ("January 27, 2016 Press Release"), announcing Santander Consumer's financial results for the fiscal year ended December 31, 2015.

     61.     In the January 27, 2016 Press Release, the Company announced net income of $866.357 million, or $2.41 per diluted common share, for the fiscal year ended December 31, 2015.

     62.     The foregoing statement in the January 27, 2016 Press Release with respect to the Company's net income and net income per diluted common share for the fiscal year ended December 31, 2015 were false and misleading.  The Company corrected its accretion methodology, impacting its balance sheets as detailed in the Annual Report on Form 10-K/A for the year ended December 31, 2015, which Santander Consumer filed with the SEC on October 27, 2016, excerpts of which are attached hereto as Exhibit C and incorporated herein by reference.  Defendants knew or were reckless in not knowing that, for the fiscal year ended December 31, 2015, they overstated net income by $42.317 million, or 5.1%, and net income per diluted common share by $0.10, or 4.3%.

     63.     Also on January 27, 2016, at 9:00 a.m., the Company held an earnings conference call with investors to discuss its financial results for the fiscal year ended December 31, 2015 ("January 27, 2016 Earnings Call").  Defendants Kulas and Davis participated in the January 27, 2016 Earnings Call.

     64.     During the January 27, 2016 Earnings Call, Defendant Kulas discussed the

highlights of the Company's financial results for the fiscal year ended December 31, 2015. Defendant Kulas stated, among other things, that "[t]otal net income for the year was a record $866 million."

65.     The foregoing statement made by Defendant Kulas in the January 27, 2016 Earnings Call was false and misleading.  The Company corrected its accretion methodology, impacting its balance sheets as detailed in the Annual Report on Form 10-K/A for the year ended December 31, 2015, which Santander Consumer filed with the SEC on October 27, 2016, excerpts of which are attached hereto as Exhibit C and incorporated herein by reference. Defendants knew or were reckless in not knowing that, for the fiscal year ended December 31, 2015, they overstated net income by $41.960 million, or 5.1%.

66.     The extent of the Defendants' recklessness can be observed by comparing the balance sheets originally disclosed to those restated in the Form 10-K/A that was filed on March 31, 2016.  Excluding totals and subtotals, the Defendants reported fourteen asset categories on its balance sheet in 2015.  Of these, Defendants restated nine, or 69%, of these asset categories.  *See* 2015 10-K/A, at Note 2.  In other words, Defendants got the numbers wrong over two-thirds of the time.  A similar statistic can be found when looking at the liability accounts.  Out of the nine categories, five, or 56%, had to be restated.  *See id.*  The restatement of the Statements of Income and Comprehensive Income show a similar pattern, with Defendants having to restate half of the accounts disclosed.  *See id.*

VI.     **THE TRUTH EMERGES**

67.     On July 2, 2015, after the market closed, the Company filed a Form 8-K with the SEC.  Therein, the Company announced that, effective as of the close of business on July 2, 2015, (1) Defendant Dundon had stepped down from his roles as Chairman of the Board and CEO of the Company, (2) the Board had appointed Defendant Kulas to replace Dundon as CEO

24

and to serve as a member of the Board, and (3) director Stephen A. Ferriss had been appointed as Chairman of the Board.  The Company also announced the terms of its Separation Agreement with Dundon and a Second Amendment to the Shareholders Agreement that would affect the compensation Dundon would receive upon termination.  *See infra* at ¶¶105-09.

68.     On this news, the Company's stock price fell $2.19 per share, or 8.4%, to close at $24.01 on July 6, 2015, the next trading day after the announcement, on high trading volume.

69.     This drop in the Company's stock price reflected the market's speculation that Dundon's resignation may have indicated an undisclosed issue regarding the financial position of the Company, as indicated by the questions from analysts during a conference call on July 2, 2015 (which occurred after the market closed).  *See infra* at ¶111.  That speculation was later confirmed when the Company restated its financial results.

70.     On February 29, 2016, after the market closed, the Company filed a NT 10-K with the SEC on Form 12b-25.  Therein, the Company, in relevant part, stated:

> Santander Consumer USA Holdings Inc. (the "Company") is delaying the filing of its Annual Report on Form 10-K for the Company's fiscal year ended December 31, 2015 (the "Form 10-K") at this time because the Company's financial statements have not yet been completed. The Company currently has an open comment letter from the Division of Corporation Finance of the Securities and Exchange Commission (the "SEC") on the Company's Form 10-K for the fiscal year ended December 31, 2014 and Form 10-Q for the quarter ended September 30, 2015 with respect to the Company's credit loss allowance, including the removal of seasonality and the increase in troubled debt restructuring ("TDR") impairment during the quarter ended September 30, 2015 as well as certain TDR disclosures in both periods. The Company continues to discuss these matters with the SEC and the Company's independent registered public accounting firm and will file the Form 10-K as soon as possible.

71.     On March 15, 2016, the Company filed a Current Report with the SEC on Form 8-K.  Therein, the Company, in relevant part, stated:

> Item 3.01. Failure to Satisfy a Continued Listing Rule or Standard.
>
> (b) Santander Consumer USA Holdings Inc. ("SC" or the "Company") will be

delayed in filing its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 (the "Form 10-K"), beyond the March 15, 2016, extended filing date. The Company is working diligently to file the Form 10-K as soon as practicable.

As the Company previously disclosed in its Form 12b-25 filed with the Securities and Exchange Commission (the "SEC") on February 29, 2016, the Company's financial statements have not yet been completed. The Company currently has an open comment letter from the SEC's Division of Corporation Finance on the Company's Form 10-K for the year ended December 31, 2014, and Form 10-Q for the quarterly period ended September 30, 2015, with respect to estimating the Company's credit loss allowance, including the removal of seasonality and the increase in troubled debt restructuring ("TDR") impairment during the quarterly period ended September 30, 2015, as well as certain TDR disclosures.

After review, the Company is changing its methodology for estimating credit loss allowance on individually acquired retail installment contracts and will correct prior periods in Item 9B in the Form 10-K.

The Company does not foresee any interruption or change to normal business activities.

On March 15, 2016, the Company notified the New York Stock Exchange ("NYSE") that it is not in compliance with Rule 8.01E of the NYSE's listed company manual as a result of its failure to file the Form 10-K within the extended time period. As stated above, the Company is working diligently to file its Form 10-K as soon as practicable and to remedy its non-compliance with the foregoing rule.

72.     On this news, the Company's shares fell $1.70 per share, or 16%, over two trading sessions to close on March 16, 2016, at $9.00 per share, on high trading volume.

73.     On September 23, 2016, the Company issued a press release (the "September 23, 2016 Press Release") announcing that it would be "restating financial statements and associated disclosures for the full years 2013, 2014 and 2015, and the quarters within 2014 and 2015, as well as the first quarter of 2016, due to errors identified in the financial statements for each of those periods." The Company stated in the September 23, 2016 Press Release:

Santander Consumer USA Holdings Inc. (NYSE: SC) ("SC" or the "Company") today announced that it will be restating financial statements and associated disclosures for the full years 2013, 2014 and 2015, and the quarters within 2014

and 2015, as well as the first quarter of 2016, due to errors identified in the financial statements for each of those periods. The Audit Committee of the Company's Board of Directors has concluded these financial statements and disclosures should no longer be relied upon. The Audit Committee acted on the recommendation of SC's management and in consultation with the Company's current and former independent registered public accounting firms, respectively PricewaterhouseCoopers LLP ("PwC") and Deloitte & Touche LLP ("Deloitte").

The errors leading to this restatement were identified after the Company's previously disclosed transition of audit firms. The transition occurred in response to new corporate governance recommendations related to external auditor rotation.

Management has determined that the errors should be corrected through the issuance of restated financial statements, which will be included in amendments to prior filings. The conclusion to restate financial statements is based on an assessment of both quantitative and qualitative considerations, including aggregation of all known errors with those previously corrected in the restatement effected through the filing of the 2015 Form 10-K on March 31, 2016.

The restatements announced today are primarily being made to correct errors associated with the following:

- The Company's methodology for accreting dealer discounts, subvention payments from manufacturers and capitalized origination costs
- The Company's lack of consideration of net discounts when estimating the allowance for credit losses
- The discount rate used in determining the impairment for loans accounted for as troubled debt restructurings ("TDRs")

Based on management's preliminary assessment, the expected cumulative impact of the errors is an increase to total equity of approximately 1%, as of March 31, 2016. The Company also believes these restatements will increase previously reported net income for the fiscal quarter ended March 31, 2016, by approximately $9 million, or $0.02 per share. The impact on total equity and net income varies in each of the prior quarters. Similarly, the impact of the errors varies by financial statement line item. Further details, as well as reconciliations of previously reported to preliminarily restated figures for certain historical quarterly and annual filings, are available in Tables 1-4 located in the financial supplement of this press release.

"Since the identification of errors in our financial reporting, we have been completely focused on ensuring we correct everything as quickly and transparently as possible – engaging with our regulators, completing a rigorous review of our financial statements, and updating shareholders regularly," said Jason Kulas, President and Chief Executive Officer. "We are entirely committed

27

to achieving the highest standards of integrity within our financial reporting and control environment and believe that the actions we are announcing today are a further important step toward achieving that goal. We would like to assure our customers and partners that the issues uncovered relate to non-cash items only, meaning they have no impact on our ability to continue delivering the high levels of service our customers rightly expect."

In addition, the Company expects to report the existence of additional, previously unreported material weaknesses in internal control over financial reporting. Management continues to assess the nature and extent of these additional material weaknesses and their impact on the Company's reports on the effectiveness of internal control over financial reporting, and its disclosure controls and procedures, and is working to implement remedial measures.

The Company is working through the appropriate governance process and will file amended annual and quarterly reports, as well as its Form 10-Q for the quarter ended June 30, 2016, as soon as possible, and expects to complete the amended filings prior to the deadline for filing its Form 10-Q for the quarter ended September 30, 2016. The Company has received waivers for certain debt facilities that require timely filings. The Company also will likely delay the previously announced third quarter 2016 earnings call date, currently scheduled for October 26, 2016, at 9 a.m. Eastern Time. Management will provide updates on the timing of the filings and earnings call as appropriate.

Santander has taken the following steps to address legacy issues and improve its oversight and internal controls:

- December 2014: Timothy Ryan named Chairman of SC's parent company Santander Holdings USA, Inc. ("SHUSA"), and affiliate Santander Bank, NA boards
- March 2015: Scott Powell named CEO of SHUSA
- July 2015: Jason Kulas named CEO of SC, and Blythe Masters named Chair of SC
- September 2015 – February 2016: New SC Senior Leadership team named, including new General Counsel, Chief Financial Officer, Chief Operating Officer, Chief Compliance Officer, Chief Risk Officer, Chief Information Officer and Chief Human Resources Officer
- July 2016: William Rainer named Chairman of SC, succeeding Blythe Masters who has taken on new responsibilities within the Santander Group
- September 2016: Scott Powell joins SC board

74.     On October 27, 2016, after the close of the market, the Company filed with the

SEC a Quarterly Report on Form 10-Q for the second fiscal quarter ended June 30, 2016 ("June

30, 2016 Form 10-Q"), as well as its amended Quarterly Reports for the first, second, and third

28

fiscal quarters of 2015, its amended Annual Report for the 2015 fiscal year, and its amended Quarterly Report for the first fiscal quarter of 2016. "The restated filings," according to an accompanying press release issued the same date (the "October 27, 2016 Press Release"), by Santander Consumer, "correct[ed] all known errors in the respective filings, the most significant of which [were]": (1) "the Company's methodology for accreting dealer discounts, subvention payments from manufacturers and capitalized origination costs"; (2) "the Company's lack of consideration of net discounts when estimating the allowance for credit losses"; and (3) "the discount rate used in determining the impairment for loans accounted for as troubled debt restructurings."

75. "In addition," the October 27, 2016 Press Release continued, "as previously disclosed, the Company reported the existence of additional material weaknesses in internal control over financial reporting. A description of all material weaknesses can be found in Item 4 of the Q2 2016 10-Q and the respective 10-Q/As, and in Item 9A of the 2015 10-K/A."

76. More precisely, for example, with respect to the restatement, in these various amended filings, the Company stated, in relevant part:

2. Corrections of Errors

Subsequent to the issuance of the Company's June 30, 2015 condensed consolidated financial statements, the Company identified errors in its historical financial statements, including for the three and six months ended June 30, 2015 and 2014. Accordingly, the Company has restated the unaudited interim condensed consolidated financial statements as of and for the three and six months ended June 30, 2015 and 2014 to reflect the error corrections, the most significant of which are as follows:

**I.     Errors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2015 filed on March 31, 2016 (the "Original 10-K"):**

•       The Company determined that its historical methodology for estimating its credit loss allowance for individually acquired retail installment contracts held for

investment was in error as it did not estimate impairment on troubled debt restructurings (TDRs) separately from a general credit loss allowance on loans not classified as TDRs, and incorrectly applied a loss emergence period to the entire portfolio rather than only to loans not classified as TDRs. In addition, the Company determined that it had incorrectly identified the population of loans that should be classified and disclosed as TDRs and, separately, had incorrectly estimated the impairment on these loans, as of each balance sheet dates. The Company has corrected its allowance methodology accordingly, and has determined, based on this corrected methodology, the the credit loss allowance reported on the condensed consolidated balance sheets as of June 30, 2015 and December 31, 2014 was overstated by $110,462 and $56,508, respectively.

The Company determined that subvention payments related to leased vehicles were incorrectly classified, within the income statement, as an addition to Leased vehicle income rather than a reduction of Leased vehicle expense. The subvention payments classification errors did not impact net income for any period.
The impact of the corrections of the above errors on the financial statements for the three and six months ended June 30, 2015 and 2014 was disclosed in Part II, Item 9B of the Original 10-K.

## II.  Errors identified subsequent to the filing of the Original 10-K:

•       The Company previously used the loans' original contractual interest rate rather than the original effective rate as the discount rate applied to expected cash flows to determine TDR impairment. ASC 310-40-35-12 requires that expected future cash flows be discounted using the original effective interest rate.

The Company has corrected the discount rate used in the determination of TDR impairment and has determined that the allowance was understated, and the net carrying balance of individually acquired retail installment contracts accordingly overstated, by $73,321 and $68,642 as of June 30, 2015 and December 31, 2014, respectively, related to this methodology error. This error also caused the provision for credit losses in the condensed consolidated statements of income and comprehensive income to be overstated by $1,402 and understated by $2,476 for the three months ended June 30, 2015 and 2014, respectively, and understated by $4,679 and $3,405 for the six months ended June 30, 2015 and 2014, respectively.

• The Company has determined that its application of the retrospective effective interest method for accreting discounts, subvention payments from manufacturers, and other origination costs (collectively "discount") on individually acquired retail installment contracts held for investment was in error, as (i) these cost basis adjustments were accreted over the average life of a loan rather than the aggregate life of a loan pool, (ii) defaults were inappropriately considered in the estimate of future principal prepayments, (iii) the portfolio was not adequately segmented to consider different prepayment performance based on credit quality and term, (iv)

remaining unaccreted balances at charge off were being recorded as interest income rather than as reductions of the net charge off, and (v) the unaccreted discount component of TDR carrying value was misstated, resulting in inaccurate TDR impairment.

(i) The Company previously had accreted discounts over the average life of the loan portfolio. However, Examples 3 and 4 in the implementation guidance to ASC 310-20, Receivables - Nonrefundable Fees and Other Costs, provide guidance on the projection of cash flows for a pool of loans and the treatment of actual and anticipated prepayments for determining the effective interest rate under the retrospective method. The guidance demonstrates an application that aligns with the aggregate life of the loan pool rather than the average loan life concept. Under the average life method previously applied by the Company, anticipated prepayments shortened the life of the portfolio and maintained the portfolio monthly cash flows constant, i.e., incorrectly accelerated the accretion of discount. Accordingly, management has determined that the use of the average life was in error.

(ii) The Company previously had considered all types of liquidations, both voluntary prepayments and charge offs, as anticipated prepayments for purposes of determining a prepayment assumption. However, the application of a prepayment assumption as described in ASC 310-20-35-26 does not allow for future expected defaults to be considered in the assumption. Accordingly, management has determined that the inclusion of future expected defaults in the anticipated prepayment assumption was in error.

(iii) The Company previously had aggregated all loans in the individually acquired retail installment contract portfolio into one pool for the purpose of estimating prepayments and determining the effective interest rate under the retrospective method. ASC 310-20-35-30 provides some characteristics to be considered when aggregating a large number of similar loans for this purpose. Management has determined that there is differentiation in prepayment behavior within its loan portfolio based on characteristics including credit quality, maturity, and period of origination. Accordingly, management has determined that the absence of segmentation into pools of homogeneous loans was in error.

(iv) The Company previously had recorded charge offs based on unpaid principal balance. The accretion of discount of charged off loans was previously reported as interest income. However, ASC 310-10, Receivables, refers to the recorded investment in the loan as the appropriate accounting basis. ASC 310-10-35-24 specifies that the recorded investment includes adjustments such as unamortized premium or discount. Accordingly, management has determined that unaccreted discounts remaining at charge off should be included in the net charge off amount recorded.

(v) As a result of the incorrect accretion methodology, as well as the exclusion of

unaccreted discount, the recorded investment in TDRs was misstated, resulting in a misstatement of TDR impairment.

77.     The Company continued, providing specific corrections that rendered their class period financial statements false and misleading.   For example, the Company corrected its accretion methodology and described the impacts on its various financial statements, incorporated herein by reference as follows:

a.      Notes 2 and 19 to the Financial Statements in the 2015 Form 10-K/A, filed with the SEC on October 27, 2016, are attached hereto in Exhibit C and incorporated herein by reference.   These Notes contain the impact of Defendants' knowing or recklessly false accounting on the Company's Balance Sheets and Statements of Income  for the years ended December 31, 2014 and December 31, 2015 and quarterly data for those same years;

b.      Note 2 to the Financial Statements in the Form 10-Q/A for the period ended March 31, 2015, filed with the SEC on October 27, 2016, is attached hereto in Exhibit D and incorporated herein by reference.   This Note contains the impact of Defendants' knowing or recklessly false accounting on the Company's Balance Sheets and Statements of Income for the three months ended March 31, 2015;

c.      Note 2 to the Financial Statements in the Form 10-Q/A for the period ended June 30, 2015, filed with the SEC on October 27, 2016, is attached hereto in Exhibit E and incorporated herein by reference.   This Note contains the impact of Defendants' knowing or recklessly false accounting on the Company's Balance Sheets and Statements of Income for the three and six months ended June 30, 2015;

d.      Note 2 to the Financial Statements in the Form 10-Q/A for the period ended September 30, 2015, filed with the SEC on October 27, 2016, is attached hereto in Exhibit F and incorporated herein by reference.   This Note contains the impact of Defendants' knowing

or recklessly false accounting on the Company's Balance Sheets and Statements of Income for

the three and nine months ended September 30, 2015.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   Defendants Violated GAAP By (1) Failing To Maintain Effective Internal Controls And (2) Reporting Materially False Financial Statements

78.     Santander Consumer failed to comply with its obligations imposed by the SEC to

maintain books and records in sufficient detail to reflect the transactions of the Company and to

prepare financial statements in accordance with GAAP.[11]   Section 13(b) 2 of the Exchange Act

entitled *Periodical and Other Reports* states the following with respect to books and records and

internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A.     Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> i.     transactions are executed in accordance with management's general or specific authorization;
>
> ii.     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
>
> iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

---

[11] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

79.    A good system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations.   It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").[12]

80.    The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations.   More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

81.    The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

---

[12] Generally accepted auditing standards codified in AU §319, Consideration of Internal Control in a Financial Statement Audit, is based on the internal control framework described in the COSO Report. The COSO report was issued in September 1992 as a four-volume set. Additional modifications and updates of the framework have been issued with the most recent Integrated Framework being issued in 2013 as a three-volume set.

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[13]

82.    The COSO Report describes internal control within a certain framework that consists of five separate components. It requires that financial statements prepared for external use are fairly presented in conformity with generally accepted accounting principles and regulatory requirements. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

83.    Everyone in an organization has responsibility for internal control. The CEO, however, sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. The influence of the CEO on an entire organization cannot be overstated."[14]   The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.   The Addendum to the COSO Report makes it clear that the company's chief

---

[13] *See* COSO Report, Chapter 3; see also Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

[14] COSO Report, Chapter 8, p. 84.

accounting officer—who in the case of Santander Consumer was Kulas (and later, Davis), its CFO—plays a critical role with respect to the internal control system.

84.     Specifically, the CEO, Dundon (and later, Kulas), and the CFO, Kulas (and later, Davis), failed to comply with SEC regulations and the requirements of COSO.  As described herein there were material weaknesses in internal control at Santander Consumer that were necessary to prepare accurate financial statements and unsure compliance with regulatory filing requirements applicable to public companies.[15]  A material weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[16]  Santander Consumer's internal control system failed to live up to the standards as set forth in the five elements of the internal control framework described above in ¶82.  Defendants Dundon, Kulas, and Davis failed to maintain a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP.

85.     In the Company's prior and current public filings, Defendants Dundon, Kulas and David disclosed that controls over financial reporting were not effective as of December 31, 2015.[17]  However, in the Company's Form 10-K for the period ended December 31, 2014, Defendants Dundon and Kulas stated that controls over financial reporting were effective.  This

---

[15] 2015 10-K, Item 9A.

[16] The Public Company Accounting Oversight Board's ("PCAOB") definition is identical, except is replaces the word "registrant's" with "company's" and notes that "There is a reasonable possibility of an event, as used in this standard, when the likelihood of the event is either 'reasonably possible' or 'probable,' as those terms are used in Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies ('FAS 5')."  AS 5 ¶A7.

[17] 2014 10-K, Item 9A.

statement was false.  These representations were false when made, given the disclosure made on March 30, 2016 and the subsequent revision to the Company's Form 10-Qs for the periods ended March 31, 2014, June 30, 2014 and December 31, 2015.

86.     The existence of these material weaknesses enabled the Defendants to circumvent the Company's accounting policies caused a misstatement and understatement of costs and resulted in an overstatement of net income throughout the Class Period.

87.     As of October 27, 2016 Santander Consumer still had work to do in order to have a proper internal control process.

88.     As a result of the material internal control weaknesses described above, Santander Consumer failed to comply with SEC regulations and the requirements of COSO.   The Company's management had established a poor tone at the top, which rendered the Company unable to perform the necessary levels of monitoring and oversight or resolve complex accounting issues.   This was all the more important given that Santander Consumer had an insufficient number of personnel with the appropriate levels of experience.

89.     Thus, Defendants knew that these material internal control weaknesses existed throughout the Class Period.

90.     The Company represented its financial results and statements in a manner which materially violated GAAP, including the following fundamental accounting principles:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(b)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(c) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibility for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(d) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(e) The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(f) The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions, was violated (FASB Statement of Concepts No. 2, ¶79); and

(g) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2 ¶¶95, 97).

91. On March 31, 2016 the Company disclosed in its Form 10-K filing that did not properly determine impairment for individually acquired retail installment agreements and it incorrectly identified the population of loans that should be accounted for as TDRs in accordance with GAAP. In addition, Defendants incorrectly classified the Company's lease vehicles.

92. As a result, on March 31, 2016, the Company disclosed that it credit loss allowance on its consolidated balance sheets as of December 31, 2013 and 2014 were overstated by $56,508 and $122,374, respectively, rendering those statements false and misleading.

93. On October 27, 2016 the Company disclosed in its Form 10-K/A that the

information included in its March 31, 2016 Form 10-K was false and therefore must be restated so that its financial reports would be stated in accordance with GAAP.

94.     Management is responsible to ensure proper controls over the preparation and review of its financial statements on which the public relies.  In its SEC filings, management has admitted that it did not maintain effective internal controls over its financial reporting.  As a result, the investing public relied upon information supplied by the Company and its management which was false and misleading to investors.

95.     Deloitte & Touche, LLP, the Company's independent registered public accounting firm, issued a March 30, 2016 report concerning the internal controls over the Company's financial reporting and an October 27, 2016 report dated October 27, 2016 concerning the effects of additional material weaknesses in financial reporting, which together demonstrate that the Company did not institute the proper policies and procedures to ensure that the investing public could rely upon the financial information it was providing.

96.     In addition to the errors contained in its Form 10-K filed on March 31, 2016 discussed above, the Company disclosed the discovery of errors in the management's falsification of Santander Consumer's financial statements.

97.     In each successive filing that restated the TDRs the recorded investment in retail installment contract TDRs declined, showing that the originally and subsequently reported balances were overstated.

| Description | Per 2015 Form 10-K/A | Per 2015 Form 10-K | Per 2014 10-K |
|---|---|---|---|
| 2014 | $2,871,921 | $2,940,563 | $3,409,797 |
| 2015 | $3,238,479 | 3,311,288 | N/A |

98.     Furthermore, the Company's transactions with Defendant Dundon were in error since all conditions required to record the transaction were not met and ultimately were reversed

39

in the Form 10-K/A filing, demonstrating a lack of management control over its financial reporting.

99.    In addition to the errors contained in its Form 10-K filed on March 31, 2016 discussed above, errors were subsequently discovered which disclosed in additional falsification of its financial statements by management and the Company.    Specifically, the following additional violations of GAAP were identified: (1) use of the original contractual interest rate rather than the original effective interest rate as required by GAAP (ASC 310-40-35-12) as the discount rate applied to expected cash flow to determine the TDR impairment; (2) application of the accretion of discounts over the average life of the loan portfolio rather than the retrospective method provided for in implementation guidance under ASC 310-20; (3) consideration of all types of liquidation events for purposes of determining its prepayment assumptions, even though ASC 310-20-35-26 does not allow for this treatment under GAAP; (4) failure to consider loan portfolio based criteria including credit quality, maturity, and period of origination in order to segregate the pools of loans into homogeneous groups as required under GAAP and ASC310-20-35-20; and (5) failure to consider the accretion of discounts in determining charge offs in violation of GAAP under ASC 310-10-35-24.   Each of the above were clear applications of GAAP which should have been followed.   Had management appropriately followed the clear and unambiguous GAAP guidance, its financial statements would not have contained false and misleading statements

100.    Thus, as to Defendants' violations of prescriptive GAAP, requiring little if any judgment, Defendants knew or were reckless in not knowing that the financial results that the Company reported during the Class Period were false and misleading.   Prior to issuing their financial statements during the Class Period, Defendants knew or were reckless in not knowing

of the likelihood of material misstatements as a direct result of weak internal controls over financial reporting and the Company's failure to apply GAAP to TDRs.

101.    In addition, the Defendants knew or were reckless in not knowing that the application of GAAP by Santander Consumer was inappropriate.  The errors discussed above were basic elements of GAAP, including which items should be treated as TDR's and how they should be accounted for in the books and records.

102.    The improper application of controls over financial reporting enabled Santander Consumer to bypass GAAP, resulting in the systematic overstatement of net income that was used by investors in making an investment decision.

**B.      Defendant Dundon Was Motivated To Inflate The Company's Stock Price In Anticipation Of His Resignation From The Company And The Cash Out Of The Shares He Owned Through DDFS**

103.    As detailed below, throughout the first four months of the Class Period prior to his resignation as CEO of the Company, Defendant Dundon had an incentive to overstate the Company's financial results and thereby inflate the price of the Company's stock because he knew he would be cashing out his position in DDFS upon resignation.  Based on the Company's materially overstated financial results for 4Q 2014, FY 2014 and 1Q 2015, the Company's stock prices soared to historic highs shortly before the Company announced Dundon's resignation on July 2, 2015.  Accordingly, Dundon was able to negotiate a Separation Agreement and an amendment to the Shareholders Agreement that would allow him to cash out his position for more than $928 million, a price that exceeded by more than $250 million the price he would have received had he cashed out his position four months earlier, before the materially overstated 4Q 2014, FY 2014 and 1Q 2015 results had been released.

104.    On July 2, 2015, the Company issued a press release and filed a Form 8-K

announcing that, effective as of the close of business on July 2, 2015, Defendant Dundon had stepped down from his roles as Chairman of the Board and CEO of the Company.  In the same announcement, the Company disclosed that the Board had appointed Defendant Kulas to replace Dundon as CEO and to serve as a member of the Board, and that director Stephen A. Ferriss had been appointed as Chairman of the Board.

105.    In the July 2, 2015 Form 8-K, the Company also announced the terms of its Separation Agreement with Dundon and attached a copy of that agreement.  The Separation Agreement provided that Dundon would resign as Chairman of the Board and CEO but that he would continue to serve as a director of and consultant to the Company.  The Separation Agreement further provided that Dundon's resignation would be treated as a termination "other than for Cause" or "without Cause," as applicable, for purposes of Dundon's pre-existing employment agreement and any Company equity awards.

106.    The Separation Agreement confirmed that Dundon would receive, subject to limitations of banking regulators and applicable law, the following payments and benefits that had been provided for under the terms of his pre-existing employment agreement:

- a lump sum payment equal to two times the sum of Dundon's annual base salary and target annual cash performance bonus;

- a lump sum payment equal to Dundon's current salary, prorated through the Termination Date (*i.e.*, July 2, 2015);

- continued welfare benefits (including life, long-term disability and other fringe benefits) for Dundon and his dependents, on the same basis as provided to actively employed senior executives of the Company, until (i) the third anniversary of the Termination Date, or (ii) with respect to benefits under

Company's health insurance plan, the 18-month anniversary of the Termination

Date; and

- any accrued unpaid base salary, business expense reimbursement, and vacation
  through the Termination Date.

107.    The Separation Agreement also provided additional benefits beyond those provided in Dundon's pre-existing employment agreement.  Among other things, the Separation Agreement provided that upon his termination of employment, Dundon's unvested restricted stock awards and outstanding stock options would vest in full and that all shares acquired upon the exercise of stock options awarded to Dundon in December 2011 would become freely transferable and free of any restrictions on sale.  In addition, the Separation Agreement provided that any service-based vesting requirements that were applicable to Dundon's outstanding restricted stock units and deferred cash award in respect of his 2014 annual bonus would be waived on his date of termination, and such awards would vest and be settled in accordance with the underlying award agreements.  Once again, the Company announced that these benefits were subject to limitations of banking regulators and applicable law.

108.    Most importantly, in connection with and pursuant to the Separation Agreement, the Company, SHUSA, DDFS, Dundon, and Banco Santander entered into an amendment (the "Second Amendment") to the Shareholders Agreement dated as of January 28, 2014, by and among the Company, SHUSA, DDFS, Dundon, Sponsor Auto Finance Holdings Series LP, and Banco Santander.  Among other things, the Shareholders Agreement provided that Dundon could require SHUSA to purchase the Company stock owned by DDFS under certain circumstances (such as the expiration of Dundon's employment under the employment agreement or his termination by the Company for a reason other than good cause) (the "Employment Put Option")

43

and that SHUSA could require Dundon to sell the Company stock owned by DDFS under certain circumstances (such as the expiration of Dundon's employment under his employment agreement or his termination by the Company for any reason) (the "Employment Call Option"). Pursuant to the Shareholders Agreement, the price at which the shares owned by DDFS would be purchased by SHUSA was the "Average Stock Price," which was defined as the arithmetic mean of the daily volume-weighted average price for each of the ten consecutive trading days ending on (and including) the trading day immediately prior to the applicable determination date (e.g., the date on which Dundon exercised the Employment Put Option or the date on which SHUSA exercised the Employment Call Option).

109.    The Second Amendment amended, for purposes of calculating the price per share to be paid in the event that Employment Put Option or the Employment Call Option were exercised, the definition of the term "Average Stock Price" to mean $26.83.  Pursuant to the Separation Agreement, SHUSA was deemed to have delivered as of July 3, 2015 an irrevocable notice to exercise the Employment Call Option with respect to all the shares of Company common stock owned by DDFS and consummate the transactions contemplated by such call option notice, subject to required bank regulatory approvals and any other approvals required by law being obtained (the "Call Transaction").

110.    At the time of Dundon's resignation, DDFS owned 34,598,506 shares of Company common stock.   Therefore, at the price of $26.83, the consummation of the Call Transaction pursuant to the terms in the Second Amendment would have entailed payment to Dundon of more than $928 million in exchange for the Company shares owned by DDFS.

111.    On July 2, 2015, Defendant Kulas, the newly appointed CEO, conducted a conference call with analysts and attempted to reassure investors that the sudden, unexpected

change in the Company's leadership was unrelated to any issue in connection with the Company's financial performance.  Kulas emphasized to analysts that Dundon's resignation was Dundon's decision (rather than the Company's decision to remove Dundon); that the Company was not privy to the specific reasons that Dundon had made the decision to resign, but that it was for Dundon's "own personal reasons"; and that Dundon's action in stepping down was based on his decision "to monetize his interest in the company."  Specifically, during the conference call, Kulas made the following statements:

**Defendant Kulas**

The changes in Tom's role at SCUSA have been amicably agreed upon and are **_unrelated to the Company's performance and regulatory standing_**. It is important to note that with Tom's departure and my appointment as CEO, SCUSA is following its succession plan.

***

**Kerry Mark, Analyst, Barclays**

Can you just maybe clarify the exercise of the call option, whether or not that was a mechanical or a decision on the part of Santander? And if there was a decision by Santander, what drove that?

**Defendant Kulas**

Yes. It was a decision -- I think it was a mutual decision between Santander and Tom. And **_the actions that led to that decision are not anything that we're privy to, other than the fact that what we know is that Tom did decide that that it was a good time for him to do this personally, for his own personal reasons_**.

***

**Kerry Mark, Analyst, Barclays**

So this is Tom's decision to step down?

**Defendant Kulas**

Yes, absolutely. And I think, again, that's highlighted by the fact that he's still going to be involved in these two roles as an Advisor and a Board Member. It's

45

very amicable and friendly and exactly the way you would want it to happen.

***

**Moshe Orenbuch, Analyst, Credit Suisse**

Maybe just a little more background as to what precipitated this. I mean it seems that he would kind of have to leave, but still could be on the Board. So it sounds to me like he's not doing something that's a direct conflict, right. So I mean is there anything else you can kind of add to that?

**Defendant Kulas**

Yes, I think that's very perceptive. ***There is no issue underlying any of this***. I think to a certain extent, this is part of a natural progression of things, where you have an entrepreneur who found the company and grows that company ***and at some point decides to monetize his interest in the company***.

(Emphasis added).

112.    Dundon's decision to "monetize his interest in the company" was remarkably well timed. On February 2, 2015, the day before the Class Period began, Santander Consumer's stock price closed at $18.63 per share. Using that immediate pre-Class Period price as a benchmark, the $26.83 price at which Dundon and the Company agreed to exchange the Company shares held by DDFS represented a 44% premium. As explicitly noted in the Second Amendment, the $26.83 price was the highest intraday trading price for the Company's common stock during the ten trading days leading up to Dundon's resignation. More broadly, however (and not mentioned in the Second Amendment), the $26.83 price represented the highest intraday trading price for the Company's common stock during the 52 weeks prior to Dundon's resignation and, indeed, the highest intraday trading price for the Company's common stock during the entirety of the Company's history as a publicly traded company. Following the market's gradual realization of the facts concealed by Defendants' fraud, the Company's stock price has cratered and has never recovered to anything close to the so-called "Average" stock price of $26.83. *See supra* at ¶¶67-

77.

113.     Defendant Dundon was motivated to inflate the Company's stock price in anticipation of his resignation with the expectation that he would be able to negotiate a separation agreement under which SHUSA would exercise the Employment Call Option. Pursuant to the Shareholders Agreement, the price at which the Employment Call Option would be transacted was the "Average Stock Price."   Whether that price was subject to the original definition of "Average Stock Price" (the mean of the daily volume-weighted average price for ten trading days leading up to his termination) or the modified definition in the Second Amendment (the highest intraday trading price during that ten day period), Dundon was motivated to overstate the financial results of the Company so that the average trading price of the Company's common stock in the period prior to his resignation would be inflated.

114.     The timing of the Company's overstatement of its financial results lines up nearly perfectly with the timing of Dundon's decision to exit from the Company so he could extract maximum value.  As revealed in the Company's restatement, the Company's originally reported financial results materially overstated net income for FY 2014 (by 5.4%) and Q1 2015 (by 16.2%).   Dundon resigned on July 2, 2015, before the financial results for Q2 2015 were released.   If Dundon were to have cashed out DDFS's position immediately prior to the Class Period (at the closing price of $18.63 on February 2, 2015), he would have received roughly $645 million rather than the $928 million amount contemplated by the Second Amendment.

115.     According to the Form 10-Q filed by the Company on November 9, 2016, the Call Transaction still has not been consummated, perhaps due to an issue with regulatory approvals.[18] The Form 10-Q also reported that Dundon, the Company, Santander and SHUSA entered into a

---

[18] In particular, the Form 10-Q stated, "To date, the Call Transaction has not been consummated and remains subject to receipt of applicable regulatory approvals."

Third Amendment to the Shareholders Agreement, which reduced the price per share to be paid to DDFS from $26.83 to $26.17, a price consistent with the original definition of "Average Stock Price" in the Shareholders Agreement.[19]   Regardless of which of those two prices is used (and regardless of whether regulatory approval of the Call Transaction is ultimately received), Dundon's expectation that he would be able to cash out DDFS's position upon resignation provided a powerful incentive for him to inflate the Company's stock price.

## VIII.   CLASS ALLEGATIONS

116.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Santander Consumer's securities between February 3, 2015 and March 15, 2016, inclusive (the "Class Period") and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

117.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Santander Consumer's securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.   Millions of Santander Consumer shares were traded publicly during the Class Period on the NYSE.   As of October 23, 2015, Santander Consumer had 357,902,036 shares of common stock outstanding.   Record owners and

---

[19] If the Call Transaction were to be consummated at the Third Amendment price, Dundon would receive roughly $905 million, rather than the roughly $928 million he would receive at the Second Amendment price.

other members of the Class may be identified from records maintained by Santander Consumer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

118.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

119.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

120.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Santander; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

121.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

IX.     **LOSS CAUSATION**

122.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

123.    During the Class Period, Plaintiffs and the Class purchased Santander Consumer's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

X.      **APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET DOCTRINE)**

124.    The market for Santander Consumer's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Santander Consumer's securities traded at artificially inflated prices during the Class Period.  On June 23, 2015, the Company's shares closed at a Class Period high of $26.52 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Santander Consumer's securities and market information relating to Santander Consumer, and have been damaged thereby.

125.    During the Class Period, the artificial inflation of Santander Consumer's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Santander Consumer's business, prospects, and

operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Santander Consumer and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

126.   At all relevant times, the market for Santander Consumer's securities was an efficient market for the following reasons, among others:

a.   Santander Consumer shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.   As a regulated issuer, Santander Consumer filed periodic public reports with the SEC and/or the NYSE;

c.   Santander Consumer regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.   Santander Consumer was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

127.   As a result of the foregoing, the market for Santander Consumer 's securities

promptly digested current information regarding Santander Consumer from all publicly available sources and reflected such information in Santander Consumer's share price. Under these circumstances, all purchasers of Santander Consumer's securities during the Class Period suffered similar injury through their purchase of Santander Consumer's securities at artificially inflated prices and a presumption of reliance applies.

## XI.  NO SAFE HARBOR

128.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Santander who knew that the statement was false when made.

## XII.  CAUSES OF ACTION

### COUNT I

#### Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

129.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

130.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Santander Consumer's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

131.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Santander Consumer's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

132.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Santander Consumer's financial well-being and prospects, as specified herein.

133.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Santander Consumer's value and performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Santander Consumer and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

134.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

135.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Santander Consumer's financial well-being and

prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

136.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Santander Consumer's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Santander Consumer's securities during the Class Period at artificially high prices and were damaged thereby.

137.   At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Santander Consumer was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Santander Consumer securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

138.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

139.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violations Of Section 20(a) Of The Exchange Act Against The Individual Defendants

140.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

141.    The Individual Defendants acted as controlling persons of Santander Consumer within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

142.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged

herein, and exercised the same.

143.    As set forth above, Santander Consumer and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:  December 20, 2016                    Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             By:    /s/ Keith Lorenze
                                             Jacob Goldberg
                                             Keith R. Lorenze
                                             TX Bar #24046313 / SDTX Bar #621638

57

101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
klorenze@rosenlegal.com

Laurence Rosen
Philip Kim
275 Madison Avenue, 34th Floor
New York, NY  10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Lesley F. Portnoy
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

**THE BRISCOE LAW FIRM, PLLC**
Willie Briscoe
8150 N. Central Expressway, Suite 1575
Dallas, Texas  75206
Telephone: (214) 239-4568
Facsimile: (281) 254-7789

*Attorneys for Plaintiffs and the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On December 20, 2016, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Texas, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 20, 2016.


*s/ Keith Lorenze*
Keith Lorenze

# Mailing Information for a Case 3:16-cv-00783-K Parmelee v. Santander Consumer USA Holdings Inc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David B Anders**
  dbanders@wlrk.com

- **R Thaddeus Behrens**
  thad.behrens@haynesboone.com,kimberly.dean@haynesboone.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com,bthompson@thebriscoelawfirm.com

- **Stephen R DiPrima**
  srdiprima@wlrk.com

- **Caitlin A Donovan**
  cadonovan@wlrk.com

- **Lionel Z Glancy**
  lglancy@glancylaw.com,dmacdiarmid@glancylaw.com,mmgoldberg@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **R Dean Gresham**
  dgresham@greshampc.com,tnichols@greshampc.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,disaacson@pomlaw.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,lfportnoy@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Keith Lorenze**
  klorenze@rosenlegal.com,etexidor@rosenlegal.com

- **Courtney Barksdale Perez**
  cperez@carterscholer.com,chopkins@carterscholer.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com

- **Laurence Rosen**
  lrosen@rosenlegal.com,awilliams@rosenlegal.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`