# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CYNTHIA A. PARMELEE, Individually and on Behalf of All Others Similarly Situated, | §<br>§<br>§ | |
| *Plaintiff*, | §<br>§ | |
| v. | §<br>§ | |
| SANTANDER CONSUMER USA HOLDINGS INC., THOMAS G. DUNDON, ISMAIL DAWOOD, JASON KULAS, and JENNIFER DAVIS, | §<br>§<br>§<br>§ | C.A. No. 3:16-CV-00783-K<br><br>**ORAL ARGUMENT REQUESTED** |
| *Defendants*. | §<br>§<br>§ | |

# DEFENDANTS' MOTION TO DISMISS
# THE AMENDED COMPLAINT AND SUPPORTING BRIEF

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF THE CASE..............................................................................................5

    A.    SC's auto lending business. ..................................................................5

    B.    SC's accounting for retail installment contracts. .......................................5

    C.    SC announces changes to its accounting methodology, and
            plaintiffs sue.........................................................................................6

    D.    SC changes its accounting methodology and issues a correction. ..........6

    E.    SC restates financial results for 2013, 2014 and 2015...........................8

    F.    Plaintiffs amend their claims. ...............................................................8

ARGUMENT ........................................................................................................................9

I.     THE SECTION 10(B) CLAIMS MUST BE DISMISSED BECAUSE
      PLAINTIFFS DO NOT PLEAD PARTICULARIZED FACTS RAISING
      A STRONG INFERENCE OF SCIENTER. .......................................................9

    A.    Plaintiffs' securities fraud claims are subject to heightened
            pleading requirements under the PSLRA and Rule 9(b). ......................9

    B.    The Fifth Circuit has consistently rejected securities fraud claims
            premised on financial restatements and other accounting errors. ..........11

    C.    SC's accounting corrections do not create a strong inference of
            scienter. .................................................................................................12

    D.    Plaintiffs' allegations against the individual defendants do not
            create a strong inference of scienter.......................................................16

    E.    Plaintiffs' allegations of "motive and opportunity" are insufficient.....................19

II.    THE SECTION 10(B) CLAIMS MUST BE DISMISSED BECAUSE
       PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION. ...................................22

III.   THE "CONTROL PERSON" CLAIMS MUST BE DISMISSED...................................25

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abrams* v. *Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ............................................................... 11, 13, 16, 20

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)................................................................................... 10

*Ashland Inc.* v. *Morgan Stanley & Co.*,
  700 F. Supp. 2d 453 (S.D.N.Y. 2010) ..................................................... 15

*Berger* v. *Beletic*,
  248 F. Supp. 2d 597 (N.D. Tex. 2003) ..................................................... 20

*Catogas* v. *Cyberonics, Inc.*,
  292 F. App'x 311 (5th Cir. 2008) .............................................. 5, 22, 25

*Cent. Laborers' Pension Fund* v. *Integrated Elec. Servs. Inc.*,
  497 F.3d 546 (5th Cir. 2007) ...................................................... 11, 17, 18

*City of Pontiac Gen. Employees' Ret. Sys.* v. *Hanger, Inc.*,
  No. A-14-CA-1026-SS, 2017 WL 384072 (W.D. Tex. Jan. 26, 2017) .................................. 17

*Congregation of Ezra Sholom* v. *Blockbuster, Inc.*,
  504 F. Supp. 2d 151 (N.D. Tex. 2007) ..................................................... 5

*Dawes* v. *Imperial Sugar Co.*,
  975 F. Supp. 2d 666 (S.D. Tex. 2013) ..................................................... 17

*DiLeo* v. *Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) ..................................................... 15

*Ferris, Baker Watts, Inc.* v. *Ernst & Young, LLP*,
  395 F.3d 851 (8th Cir. 2005) ..................................................... 12

*Fin. Acquisition Partners LP* v. *Blackwell*,
  440 F.3d 278 (5th Cir. 2006) ..................................................... 12

*Goldstein* v. *MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ..................................................... 12, 16

*Greebel* v. *FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999)..................................................... 19

*In re Bally Total Fitness Sec. Litig.*,
   No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ................................................. 14

*In re Cyberonics Inc. Sec. Litig.*,
   523 F. Supp. 2d 547 (S.D. Tex. 2007) .................................................................................. 20

*In re Dell Inc., Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008) ................................................................................. 15

*In re DRDGOLD Ltd. Sec. Litig.*,
   472 F. Supp. 2d 562 (S.D.N.Y. 2007) .................................................................................. 22

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   258 F. Supp. 2d 576 (S.D. Tex. 2003) .................................................................................. 13

*In re Hypercom Corp. Sec. Litig.*,
   No. CV-05-0455-PHX-NVW, 2006 WL 1836181 (D. Ariz. July 5, 2006) ............................ 18

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008) ........................................................................... 17, 18

*In re Integrated Elec. Servs., Inc. Sec. Litig.*,
   No. CIV.A. 4:04-CV-3342, 2006 WL 54021 (S.D. Tex. Jan. 10, 2006) ............................... 15

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ...................................................................................... 18

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014) .............................................................................. 14, 18

*In re Medicis Pharm. Corp. Sec. Litig.*,
   689 F. Supp. 2d 1192 (D. Ariz. 2009) .................................................................................. 16

*In re Novatel Wireless Sec. Litig.*,
   830 F. Supp. 2d 996 (S.D. Cal. 2011) .................................................................................. 21

*In re SCB Comput. Tech., Inc., Sec. Litig.*,
   149 F. Supp. 2d 334 (W.D. Tenn. 2001) .............................................................................. 15

*In re TETRA Techs., Inc. Sec. Litig.*,
   No. 4:08-cv-0965, 2009 WL 6325540 (S.D. Tex. July 9, 2009) ............................................ 17

*Ind. Elec. Workers' Pension Tr. Fund IBEW* v. *Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008) ........................................................................................ passim

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund* v. *Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) ..................................................................................... 16, 19, 22

*Loos* v. *Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ........................................................................ 24

*Lormand* v. *US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ........................................................................ 22

*Lovelace* v. *Software Spectrum Inc.*,
78 F.3d 1015 (5th Cir. 1996) ......................................................................... 5

*Magruder* v. *Halliburton Co.*,
No. 3:05-CV-1156-M, 2009 WL 854656 (N.D. Tex. Mar. 31, 2009).............. 12, 22

*Mortensen* v. *AmeriCredit Corp.*,
123 F. Supp. 2d 1015 (N.D. Tex. 1999) ........................................................ 12

*N. Port Firefighters' Pension-Local Option Plan* v. *Temple-Inland, Inc.*,
936 F. Supp. 2d 722 (N.D. Tex. 2013) ...................................................... 24, 25

*Oklahoma Firefighters Pension & Ret. Sys.* v. *IXIA*,
50 F. Supp. 3d 1328 (C.D. Cal. 2014) ........................................................... 21

*Owens* v. *Jastrow*,
789 F.3d 529 (5th Cir. 2015) ................................................................. passim

*Pipefitters Local No. 636 Defined Benefit Plan* v. *Zale Corp.*,
499 F. App'x 345 (5th Cir. 2012) .................................................................. 11

*Schott* v. *Nobilis Health Corp.*,
No. H-16-141, 2016 WL 5539756 (S.D. Tex. Sept. 29, 2016)...................... passim

*Southland Sec. Corp.* v. *INSpire Ins. Sols. Inc.*,
365 F.3d 353 (5th Cir. 2004) ............................................................. 10, 16, 25

*Stevelman* v. *Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999) .......................................................................... 13

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................. 9, 10

*Tuchman* v. *DSC Commc'ns Corp.*,
14 F.3d 1061 (5th Cir. 1994) ......................................................................... 9

**Statutes**

15 U.S.C. § 78t................................................................................................... 25

15 U.S.C. § 78u-4 ................................................................................. 1, 9, 10, 22

Defendant Santander Consumer USA Holdings Inc. ("SC") and the individual defendants move to dismiss the Amended Class Action Complaint (Dkt. No. 28) pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(3)(A).

## PRELIMINARY STATEMENT

The Fifth Circuit has consistently held that allegations of accounting discrepancies, standing alone, do not state a claim for federal securities fraud. To create the "strong inference" of scienter required by the PSLRA, plaintiffs must plead particularized facts showing that the accounting discrepancies were the product of fraudulent intent to mislead investors. Plaintiffs here do not come close to meeting that standard. Their claim is premised on allegations that SC restated its financials when it changed its methodology for accounting for expected loan losses. But plaintiffs plead no facts to support the notion that anyone at SC knew, or so much as suspected, that the company's accounting for loan losses was inaccurate, and they wholly ignore the fact that SC's independent auditor, Deloitte, approved financial statements based on the original accounting methodologies without reservation.

Beyond quoting SC's disclosures about the change in accounting methodology, plaintiffs say nothing of substance about SC's accounting for loan losses. They do not allege when the legacy methodology was put in place or who was involved. They do not explain how the legacy methodology worked or demonstrate that it was prone to bias the results one way or the other. And they do not allege any red flags or warning signs suggesting that the accountants at SC knew or had reason to know that there was an issue with the methodology. Plaintiffs, in short, supply none of the details necessary to meet the stringent requirements for pleading securities fraud under the PSLRA and Rule 9(b).

Indeed, far from raising a strong inference of scienter, the nature and size of the financial restatements are wholly inconsistent with any notion of a scheme at SC to mislead investors. When SC changed its methodology for accounting for loan losses in 2016, it revised earnings up in some quarters and down in other quarters, up in some years and down in others.  And even in the years in which earnings were revised down, the changes reflected only a modest impact on SC's results.  Courts in this Circuit and elsewhere have consistently held that accounting changes that cause the numbers to go up and down in different periods, or otherwise lead to a modest impact on earnings, do not bespeak an intent to skew the results.

And in this case, it is virtually impossible to square the relevant facts as alleged with plaintiffs' theory of accounting fraud.  Plaintiffs' core claim is that the legacy accounting methodology for calculating loan losses was designed to inflate SC's public market stock price. But SC's corrections to its financials revealed that that methodology was in use years before SC became a public company in January 2014.  When SC changed its accounting approach in early 2016, it corrected earnings going back to 2011, meaning that the legacy accounting methodology was in place at least three years before SC's stock traded on the public markets.  The clear inference is that the adoption of the legacy accounting methodology years before SC's IPO had nothing to do with misleading public shareholders.

Moreover, when SC changed its accounting in March 2016, it corrected its financial statements for 2011, 2012, and 2013 — the three fiscal years before SC's IPO — by *increasing* reported earnings.  Plaintiffs cannot begin to explain why SC would deliberately *understate* earnings in the three years prior to its IPO.  The clear inference from these facts is that the legacy accounting methodologies were not the product of fraudulent intent.

Without particularized facts to support their nonsensical theory, plaintiffs rely on the same generalized, conclusory allegations of scienter that the Fifth Circuit has repeatedly rejected. As the Fifth Circuit has held, allegations like those here — that the defendants violated Generally Accepted Accounting Principles, or that the company disclosed weaknesses in its internal controls, or that officers signed SOX certifications, or that a senior executive left the company during the class period — do not give rise to a strong inference of scienter and are thus insufficient to state a claim for federal securities fraud.

Plaintiffs' efforts to plead scienter rest almost entirely on allegations that when SC's founder and CEO, Tom Dundon, resigned from his position on July 2, 2015 (nearly nine months before SC disclosed the accounting corrections), he entered into an agreement to sell his SC shares to SC's parent company in connection with his departure.  Plaintiffs claim that Dundon thus had a motive to inflate SC's stock price.  But plaintiffs' contentions are unsupported by any factual detail.  Plaintiffs do not plead any facts to suggest that Dundon had any personal involvement with, or knowledge of, SC's methodology for accounting for loan losses.  In fact, plaintiffs do not plead the substance of a single communication involving Dundon concerning the accounting methodologies at issue in this case.  Plaintiffs simply assume that because Dundon was SC's CEO, he must have been aware of those issues.  But under clear Fifth Circuit law, that is insufficient to establish a strong inference of scienter.  Courts will not presume, without well-supported allegations, that non-accountants were somehow directing the accounting of a large public company.

Plaintiffs' theory of loss causation suffers from many of the same flaws — it is illogical, premised on selective facts, and barred by Fifth Circuit precedent.  To adequately plead loss causation, plaintiffs must identify "corrective" disclosures that revealed the misrepresentations to

the market and were followed by meaningful declines in SC's stock price.  The most obvious

corrective disclosures in this case occurred on March 31 and October 27, 2016, when SC detailed

changes to certain of its accounting methodologies, corrected the financial statements that had

been affected by those methodologies, and for the first time revealed the income overstatements

that prop up plaintiffs' entire fraud claim.  But plaintiffs can't rely on these corrections, because

the market's reaction when they were disclosed is fatal to their case.  On March 31, SC's stock

price *went up* $1.59, and on October 27, SC's stock price barely moved at all.  The amended

complaint does not mention these facts.

Unable to rely on the disclosures that actually corrected the accounting errors they are

suing over, plaintiffs point instead to two earlier public announcements by the company.  First,

they point to the announcement on July 2, 2015 of Dundon's resignation.  But that

announcement did not and could not mention the accounting issues concerning loan losses,

which would not surface for another nine months.  Second, plaintiffs point to disclosures on

March 15, 2016, when SC announced that it would change its method for calculating its credit

loss allowance and would "correct prior periods" in its upcoming Form 10-K.  Following that

announcement, SC's stock price fell 95 cents.  But that announcement again said nothing about

the income overstatements at the heart of plaintiffs' complaint, which were not revealed until

two weeks later.  When those overstatements (and the understatements in other periods) were

revealed, SC's stock price went up $1.59, more than erasing the earlier decline.

For the reasons set forth herein, the amended complaint should be dismissed in its

entirety and with prejudice.[1]

---

[1]     Plaintiffs also assert "control person" claims under Section 20(a) of the Exchange Act.
Those claims are entirely derivative of their primary claims under Section 10(b), and must be
dismissed for the same reasons.

**STATEMENT OF THE CASE**

A.     **SC's auto lending business.**

Defendant SC is a consumer finance company headquartered in Dallas that focuses on vehicle finance and unsecured consumer lending products.  Am. Compl. ¶¶ 2, 11.  SC's primary business is financing consumer auto loans by purchasing "retail installment contracts," or "RICs," from car dealers.  *Id.* ¶ 18.  SC is majority owned by Santander Holdings USA, Inc. ("SHUSA"), *id.* ¶¶ 4, 19, and its common stock has traded on the New York Stock Exchange since its initial public offering on January 23, 2014.  *See id.* ¶¶ 11, 20.  SHUSA owns approximately 60% of SC's stock.  *Id.* ¶ 19.

The individual defendants are present and former officers of SC.  Tom Dundon was part of the small group that founded SC in the mid-1990s, and he served as its Chief Executive Officer from 2006 until he left the company in July 2015.  *Id.* ¶ 12; Ex. A at App. 7-9.[2]  Jason Kulas has been SC's CEO since July 2015, and had previously served as Chief Financial Officer since 2007.  Am. Compl. ¶ 14.  Jennifer Davis served as interim CFO from July 2015 until December 2015, and otherwise served as Deputy CFO during all relevant times.  *Id.* ¶ 15.  And Ismail Dawood has served as SC's CFO since December 2015.  *Id.* ¶ 13.

B.     **SC's accounting for retail installment contracts.**

SC holds most of its RICs for investment and treats them as receivables for accounting purposes.  *Id.* ¶ 21.  SC accounts for these RICs using the "retrospective effective interest method," which allows it to look at a pool of loans and make a prediction of how and when to

---

[2]     On a motion to dismiss a securities fraud claim, "the court may consider (1) documents attached or incorporated into the complaint, (2) the contents of relevant public disclosure documents required to be filed and actually filed with the SEC, or (3) documents referenced in the complaint."  *Congregation of Ezra Sholom* v. *Blockbuster, Inc.*, 504 F. Supp. 2d 151, 158 (N.D. Tex. 2007); *see also Lovelace* v. *Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).  A court may also take judicial notice of stock prices.  *Catogas* v. *Cyberonics, Inc.*, 292 F. App'x 311, 316 (5th Cir. 2008).

accrete income or amortize costs based on the various attributes of that pool.  *Id.*; Ex. B at App. 13.  In accounting for RICs, SC routinely calculates an allowance for expected credit losses, which involves projecting losses from the pool in the future.  Am. Compl. ¶¶ 2, 21, 26-28.  In reporting this allowance, SC separates loans classified as troubled debt restructurings, or "TDRs," from other loans.  *See id.* ¶ 27.  TDRs are loans for which SC has granted a concession to accommodate the borrower's financial difficulties.  *Id.* ¶¶ 23-24.

### C.      SC announces changes to its accounting methodology, and plaintiffs sue.

On February 29, 2016, SC announced that it would delay filing its Form 10-K for the 2015 fiscal year due to an "open comment letter from the Division of Corporation Finance" of the SEC concerning the company's calculation of credit loss allowance and TDR impairment. *Id.* ¶ 70.  On March 15, 2016, SC filed a Form 8-K stating that it would be changing its methodology for estimating credit loss allowance on RICs and would correct prior periods in its upcoming Form 10-K.  *Id.* ¶ 71.  At the time, SC did not disclose what effects those corrections would have on its financial results.  *See* Ex. C (March 15, 2016 Form 8-K) at App. 20-22.  That day, SC's stock price fell 95 cents.  *See* Ex. D at App. 34.

Days after the March 15 disclosure, plaintiffs filed their original complaint in this case, alleging claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.  *See* Dkt. No. 1.

### D.      SC changes its accounting methodology and issues a correction.

On March 31, 2016, SC filed its 2015 Form 10-K, which identified the corrections to SC's historical methodology for calculating credit loss allowances.  *See* Am. Compl. ¶ 91.  The Form 10-K detailed the precise nature of the errors SC identified in its legacy methodology for estimating loan losses, including misidentification of the population of loans classified as TDRs,

failure to estimate losses for TDRs separately from the rest of the portfolio, and errors in the method used to calculate TDR impairment.  *See* Ex. E (2015 Form 10-K) at App. 50.

Based on its revised methodology, SC provided corrected financial results for fiscal years 2011-2013, and for yearly and quarterly periods in 2014 and 2015.  *See id.* at App. 42, 50-56. These corrected results revealed that application of the legacy methodology had caused the company to overstate net income in certain reporting periods and understate it in others.  *See id.* at App. 52-56.  For instance, these changes reflected that SC's prior methodology had caused the company to understate earnings per share by nine cents for 2011 (from $3.12 to $3.21), 12 cents for 2012 (from $2.07 to $2.19), and four cents for 2013 (from $2.01 to $2.05), and overstate earnings per share in 2014 by 11 cents (from $2.15 to $2.04) and in 2015 by 10 cents (from $2.41 to $2.31).  *Compare id.* at App. 42, *with* Ex. F (2013 Form 10-K) at App. 71; Ex. G (2014 Form 10-K) at App. 85; *and* Ex. H (January 27, 2016 Form 8-K) at App. 101.  On March 31, the day that SC disclosed these revised figures, its stock price increased $1.59, more than erasing the 95-cent decline on March 15.  *See* Ex. D at App. 34.

Although SC corrected its methodology for calculating credit loss allowances and TDR impairment in 2016 following receipt of the SEC's letter, SC's independent registered public accounting firm, Deloitte & Touche LLP, had given clean audit opinions to SC's Form 10-Ks for fiscal years 2013 and 2014 at the time they were issued, opining that SC's "consolidated financial statements" for these periods presented "fairly, in all material respects, the financial position" of the company.  Ex. F at App. 75; Ex. G at App. 90.  Deloitte had also opined that SC "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014."  Ex. G at App. 90.  And with respect to the 2015 Form 10-K, Deloitte had given an "unqualified opinion" on SC's financial statements.  Ex. E at App. 49.

**E.      SC restates financial results for 2013, 2014 and 2015.**

On September 23, 2016, SC disclosed that it would be restating its financial statements due to additional errors identified following SC's transition of audit firms from Deloitte to PricewaterhouseCoopers LLP.  Am. Compl. ¶ 73.  On October 27, 2016, SC filed amended Form 10-Ks and Form 10-Qs that restated its financial results.  *Id.* ¶ 74.  The restatement revealed that the additional errors had actually caused SC to *understate* net income more dramatically than previously reported:  SC's earnings per share were revised upward by eight cents for 2011, upward by 22 cents for 2012, upward by four cents for 2013, and were unchanged for 2014 and 2015.  *Compare* Ex. I (2015 Form 10-K/A) at App. 122, *with* Ex. E (2015 Form 10-K) at App. 42.  The day after the restatement, SC's stock price declined six cents.  *See* Ex. D at App. 38.

Consistent with the corrected financial results disclosed on March 31, the October restatements continued to show that SC's legacy accounting methodology had caused the company more often than not to understate net income.  In particular, SC had *understated* net income for 2011, 2012, and 2013 and in four of the eight quarters in 2014 and 2015.  Am. Compl. ¶¶ 3, 35-41, 47-53; *compare* Ex. I (2015 Form 10-K/A) at App. 139, *with* Ex. J (Q1 2014 Form 10-Q) at App. 156; Ex. K (Q2 2014 Form 10-Q) at App. 163; Ex. L (Q2 2015 Form 10-Q) at App. 172; *and* Ex. M (Q3 2015 Form 10-Q) at App. 180.

**F.      Plaintiffs amend their claims.**

On December 20, 2016, plaintiffs filed an amended complaint, seeking to represent a class consisting of all those who purchased SC stock between February 3, 2015 and March 15, 2016, and were damaged thereby.  Am. Compl. ¶ 116.  Plaintiffs' theory is that SC's legacy methodologies for calculating expected loan losses caused an overstatement of net income for certain reporting periods that artificially inflated SC's stock price.  *E.g.*, *id.* ¶¶ 2-3.  In particular, plaintiffs focus on income overstatements in the fourth quarter of 2014 and the first quarter of

2015.  *Id.* ¶¶ 3, 37-38, 49-50.  And they point to Tom Dundon's departure as CEO in the summer

of 2015 as an indication that the accounting mistakes must be part of a scheme to mislead

investors.  *See id.* ¶¶ 4, 103.

## ARGUMENT

**I.   THE SECTION 10(B) CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT PLEAD PARTICULARIZED FACTS RAISING A STRONG INFERENCE OF SCIENTER.**

### A.   Plaintiffs' securities fraud claims are subject to heightened pleading requirements under the PSLRA and Rule 9(b).

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, plaintiffs must

plead:  (1) a material misrepresentation or omission; (2) a defendant acting with scienter

concerning the misrepresentation; (3) reliance; (4) damages; and (5) loss causation.  *Owens* v.

*Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015).  In asserting a claim for securities fraud, a plaintiff

must satisfy the "[e]xacting pleading requirements" imposed by the PSLRA, which mandate that

plaintiffs "state with particularity . . . the facts constituting the alleged violation."  *Tellabs, Inc.* v.

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The PSLRA pleading standard

"incorporates the 'who, what, when, where, and how' requirements of Rule 9(b)."  *Owens*, 789

F.3d at 535; *see also Tuchman* v. *DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994).

The PSLRA, moreover, "enhance[s] the particularity requirements for pleading fraud

under Federal Rule of Civil Procedure 9(b) in two ways."  *Ind. Elec. Workers' Pension Tr. Fund

IBEW* v. *Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).  First, plaintiffs must "'specify each

statement alleged to have been misleading, and the reason or reasons why the statement is

misleading.'"  *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)(B)).  Second, for "'each act or omission

alleged'" to be false or misleading, plaintiffs must "'state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

As noted above, the required state of mind for a claim brought under Section 10(b) is "scienter," which in the Fifth Circuit is defined as "an intent to deceive, manipulate, defraud or severe recklessness." *Owens*, 789 F.3d at 535. Severe recklessness "is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id*. at 536.

As the U.S. Supreme Court has held, to avoid dismissal, a plaintiff asserting a claim for securities fraud must do more than plead "facts from which an inference of scienter rationally *could* be drawn." *Tellabs*, 551 U.S. at 323. Nor will an inference of scienter that is "merely 'reasonable' or 'permissible'" suffice. *Id.* at 324. Rather, a Section 10(b) claim can proceed "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* In making this determination, the court "must consider plausible, nonculpable explanations for the defendant's conduct" as compared to the culpable inferences alleged by plaintiffs. *Id.*; *see Ind. Elec.*, 537 F.3d at 533. And in analyzing whether a plaintiff meets these requirements, a court will not "strain to find inferences favorable to the plaintiffs" or "accept conclusory allegations, unwarranted deductions or legal conclusions." *Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).[3]

---

[3]     Nor do courts credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action" in determining whether a "claim has facial plausibility" under Rule 12(b)(6). *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

**B.      The Fifth Circuit has consistently rejected securities fraud claims premised on financial restatements and other accounting errors.**

In applying these standards, the Fifth Circuit has been especially hostile to securities

fraud claims, like those here, premised on mere allegations of an accounting restatement.  The

Court has "stated repeatedly" that the "mere publication of inaccurate accounting figures, or a

failure to follow GAAP, without more, does not establish scienter."  *Ind. Elec. Workers' Pension

Trust Fund IBEW* v. *Shaw Grp., Inc.*, 537 F.3d 527, 534 & n.3 (5th Cir. 2008).

Thus, in case after case, the Fifth Circuit has held that mere allegations of a GAAP

violation failed to create a strong inference of scienter.  *See Owens* v. *Jastrow*, 789 F.3d 529,

542-46 (5th Cir. 2015) (dismissing securities fraud claims based on allegations that company

violated GAAP in overvaluing MBS portfolio by $1.62 billion); *Pipefitters Local No. 636

Defined Benefit Plan* v. *Zale Corp.*, 499 F. App'x 345, 349-51 (5th Cir. 2012) (dismissing

securities fraud claims premised on financial restatements and internal control weaknesses); *Ind.

Elec.*, 537 F.3d at 534-45 (dismissing securities fraud claims based on allegations that company

violated GAAP by artificially inflating earnings by hundreds of millions of dollars); *Cent.

Laborers' Pension Fund* v. *Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552-55 (5th Cir. 2007)

(dismissing securities fraud claims based on allegations that company restated financial results

following GAAP violations and internal controls failures); *Abrams* v. *Baker Hughes Inc.*, 292

F.3d 424, 432-34 (5th Cir. 2002) (dismissing securities fraud claims based on allegations that

company restated financial results due to violations of GAAP and the company's own

accounting and operating procedures).

In this line of cases, the Fifth Circuit has consistently recognized that accounting

mistakes are often the result of nonactionable conduct.  As the Fifth Circuit has noted, the

preparation of financial statements involves "application of sophisticated accounting standards"

-11-

that "leave broad scope for judgment." *Ind. Elec.*, 537 F.3d at 536; *see also Owens*, 789 F.3d at 543-44; *Mortensen* v. *AmeriCredit Corp.*, 123 F. Supp. 2d 1015, 1017-18 (N.D. Tex. 1999).  In addition, the Fifth Circuit has noted that accounting errors may also arise from non-fraudulent conduct such as a simple mistake or oversight.  *Owens*, 789 F.3d at 543-45; *see also Magruder* v. *Halliburton Co.*, 2009 WL 854656, at *8 (N.D. Tex. Mar. 31, 2009) (dismissing fraud claims predicated on accounting restatement where plaintiffs' allegations suggested at worst "negligence, oversight, or mismanagement, none of which rise to the standard required to support a securities fraud action").

Accordingly, where the plaintiffs fail to plead particularized facts showing that the accounting discrepancies were the product of a fraudulent intent to mislead investors, the Fifth Circuit has strictly applied the requirements of the PSLRA and refused to allow the case to proceed past a motion to dismiss.  *See, e.g.*, *Owens*, 789 F.3d at 545 (inference of scienter not "equally as likely as the competing inference" that defendants were merely negligent); *Goldstein* v. *MCI WorldCom*, 340 F.3d 238, 253-54 (5th Cir. 2003) (no scienter where the complaint presented "what could best be described as allegations of mismanagement of WorldCom's accounts receivable situation").

**C.      SC's accounting corrections do not create a strong inference of scienter.**

The complaint here suffers from the same defects as the complaints dismissed by the Fifth Circuit in the cases cited above.  Plaintiffs point to the fact that SC restated its financials, but they plead no facts that would substantiate their claim that the restatements were the product of fraud.  As the Fifth Circuit has held time and again, "failure to follow accounting standards, without more, does not establish scienter." *Fin. Acquisition Partners LP* v. *Blackwell*, 440 F.3d 278, 290 (5th Cir. 2006).  *See also Ferris, Baker Watts, Inc.* v. *Ernst & Young, LLP*, 395 F.3d 851, 855 (8th Cir. 2005) ("Allegations of GAAP violations are insufficient, standing alone, to

raise an inference of scienter.  Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."); *Stevelman* v. *Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (rejecting argument that a company's "subsequent revelation of its accounting policy change and retroactive announcement of lowered earnings should be probative of conscious misbehavior or recklessness").

Plaintiffs provide no factual details concerning SC's accounting that would raise a cogent or compelling inference of scienter.  The complaint is utterly devoid of the who, what, when, where, and why necessary to plead fraud under the PSLRA and Rule 9(b).  And plaintiffs are unable to point to any "red flags" or warnings signs suggesting that anyone at SC knew or had reason to know that SC's financial statements were inaccurate.  *Owens*, 789 F.3d at 545-46 (no scienter where no "red flags" regarding accounting errors existed at the time of the misstatements).  *See, e.g.*, *Abrams*, 292 F.3d at 432-34 (no scienter where plaintiffs did not "point[] to any particular reports or information—available to defendants before the announced financial restatements—that are contrary to the restatements").

Plaintiffs' conclusory allegations of fraud are especially insufficient given that Deloitte, SC's independent auditor, gave unqualified audit opinions on the Form 10-Ks that contained the alleged accounting errors.  As the Fifth Circuit has held, allegations of scienter are undercut where there are no "publicly expressed reservations by the auditors to the financials."  *Ind. Elec.*, 537 F.3d at 535-36.  Even "a strong inference of negligence, which requires a much lower showing than severe recklessness, is negated by reliance on outside auditors' accounting."  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 617 (S.D. Tex. 2003); *see also Schott* v. *Nobilis Health Corp.*, 2016 WL 5539756, at *11 (S.D. Tex. Sept. 29, 2016) ("more plausible or at least as plausible to infer that the corporate officers were negligent in relying on

-13-

the auditors than to infer that the officers knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in their financial statements").

In this case, moreover, the accounting errors more often than not caused *understatements* of quarterly and annual net income, including understatements in fiscal years 2011, 2012, and 2013. As the Fifth Circuit has held, "[b]ecause errors could bias the figures down as well as up, the inference that such errors demonstrate an intent to defraud is weak." *Ind. Elec.*, 537 F.3d at 537. In such circumstances, the "improper accounting [does] not uniformly benefit [defendants] or consistently line up with a motive to skew the accounting results to favor [defendants'] financial position." *Schott*, 2016 WL 5539756, at *10 (no scienter where defendants' "accounting practices caused it to overstate its first-quarter 2015 revenue but to *understate* its second-quarter revenue"); *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *8 (N.D. Ill. July 12, 2006) (no scienter, "especially considering that the SEC filings and press releases at issue did not consistently overstate revenues and income or consistently understate losses").

Nor can any inference of scienter be drawn from the size of the errors. If anything, "the fact that the . . . restatement was of 'modest size' . . . actually undercuts an inference of fraud." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 286, 295 (S.D.N.Y. 2014) (understatement of net loss by 3.7 % undercut inference of scienter). The amended complaint relies heavily on income overstatements in the fourth quarter of 2014 and the first quarter of 2015, but ignores offsetting understatements in the other quarters. When all relevant reporting periods are accounted for, the combined effect of the errors was modest, resulting in total income overstatements of 5.7% for fiscal year 2014 and 5.1% for fiscal year 2015. *Compare* Ex. I (2015 Form 10-K/A) at App. 122; *with* Ex. H (January 27, 2016 Form 8-K) at App. 107. Those amounts are nowhere near enough to "disguise a failing company or turn an ostensible profit into

a loss." *In re Integrated Elec. Servs., Inc. Sec. Litig.*, 2006 WL 54021, at *3 (S.D. Tex. Jan. 10,

2006), *aff'd sub nom. Cent. Laborers'*, 497 F.3d 546.  Nor are they "so grievous as to suggest 'no

audit at all.'"  *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 904 (W.D. Tex. 2008).  Courts

routinely hold that errors of this magnitude or more are insufficient to show scienter.  *See, e.g.*,

*Owens*, 789 F.3d at 538-46 (overvaluing MBS portfolio by $1.62 billion insufficient); *Schott*,

2016 WL 5539756, at *10 (overstating net revenue by 25% insufficient); *In re SCB Comput.*

*Tech., Inc., Sec. Litig.*, 149 F. Supp. 2d 334, 353, 366 (W.D. Tenn. 2001) (overstating net income

by 1.7% in one year and 7.5% in another not supportive of scienter).

        Plaintiffs' fraud theory is also inconsistent with the nature and timing of the restatements.

Plaintiffs contend that the legacy accounting methodology was part of a scheme to defraud

public investors by inflating SC's stock price, but SC's correction of results for 2011, 2012, and

2013 show that the legacy accounting methodologies at issue were in place at least three years

before SC became a public company.  It would be absurd to suggest that SC adopted an

accounting methodology in 2011 to deceive public shareholders when SC was a private company

and wouldn't have public investors for at least another three years.  That fact weighs heavily in

favor of an inference that the adoption of the legacy accounting methodology had nothing to do

with deceiving public shareholders.

        By the same measure, plaintiffs never explain why SC would deliberately choose an

incorrect accounting methodology that would understate net income in the years leading up to its

IPO, a factor that also weighs heavily against any inference of scienter.  *Ashland Inc.* v. *Morgan*

*Stanley & Co.*, 700 F. Supp. 2d 453, 469 (S.D.N.Y. 2010) (no scienter where plaintiffs' theory of

fraud was "economically irrational"); *see DiLeo* v. *Ernst & Young*, 901 F.2d 624, 629 (7th Cir.

1990) ("[I]ndulging ready inferences of irrationality would too easily allow the inference that

ordinary business reverses are fraud.  One who believes that another has behaved irrationally has

to make a strong case.").

### D.   Plaintiffs' allegations against the individual defendants do not create a strong inference of scienter.

While plaintiffs name a number of SC's senior executives as defendants, they say *nothing*

about their actual involvement with the accounting matters at issue.  Instead of pleading facts,

plaintiffs resort to bald, conclusory statements that defendants "knew or were reckless in not

knowing" that SC's financial statements were inaccurate.  Am. Compl. ¶¶ 38, 41, 46, 50, 53, 62,

65, 135.  This type of "group pleading," which fails to specify which particular defendant knew

or did what, has been consistently rejected by the Fifth Circuit.  *See, e.g.*, *Southland*, 365 F.3d at

365 ("the PSLRA requires the plaintiffs to 'distinguish among those they sue and enlighten *each*

*defendant* as to his or her particular part in the alleged fraud'").

The complaint does not allege that any of the individual defendants knew anything about

"the details of [SC's] accounting practices," *Ind. Elec.*, 537 F.3d at 535, and thus "completely

fails to connect" them to the faulty accounting practices "in a manner that demonstrates

involvement" in alleged wrongdoing.  *MCI WorldCom*, 340 F.3d at 251; *see In re Medicis*

*Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1206 (D. Ariz. 2009) (no scienter because there

was no basis to suggest that corporate executives should have been aware of interpretation of a

GAAP provision).  Plaintiffs simply assume that the individual defendants must have known

about the accounting issues because of their positions at SC, but such an assumption is improper

as a basis for pleading scienter under black letter Fifth Circuit law.  *See Local 731 I.B. of T.*

*Excavators & Pavers Pension Trust Fund* v. *Diodes, Inc.*, 810 F.3d 951, 958 (5th Cir. 2016)

(scienter cannot be imputed to defendants based solely on their senior positions at the company);

*Abrams*, 292 F.3d at 432.

-16-

Plaintiffs also try to plead scienter by alleging that the individual defendants signed SOX certifications attesting to the accuracy of SC's financial statements.  Am. Compl. ¶¶ 45-46, 54-59.  But, as the Fifth Circuit recognizes, merely signing a SOX certification does not support scienter.  *Ind. Elec.*, 537 F.3d at 545; *Cent. Laborers'*, 497 F.3d at 555.  "To hold otherwise . . . would mean that 'scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'"  *Ind. Elec.*, 537 F.3d at 545.  Accordingly, SOX certifications are only relevant if they are signed in the face "of glaring accounting irregularities or other 'red flags,'" which plaintiffs do not allege.  *Id.*; *see Dawes* v. *Imperial Sugar Co.*, 975 F. Supp. 2d 666, 693 (S.D. Tex. 2013)*; In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6325540, at *8 (S.D. Tex. July 9, 2009); *Schott*, 2016 WL 5539756, at *11 (scienter lacking where the complaint failed to allege that the defendant "violated rules that were so clear and obvious as to make the company's officers either knowingly deceptive or severely reckless in certifying their auditor's figures on the SEC filings").[4]

Plaintiffs' allegations regarding internal control weaknesses are similarly unavailing because "[c]alling executives bad managers . . . does not plead fraud."  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1101 (C.D. Cal. 2008).  Plaintiffs' allegations that the individual defendants "set an inappropriate tone at the top amount to no more than allegations of mismanagement and thus do not contribute to a finding of scienter."  *City of Pontiac Gen. Employees' Ret. Sys.* v. *Hanger, Inc.*, 2017 WL 384072, at *12 (W.D. Tex. Jan. 26,

---

[4]     Plaintiffs identify only two accounting practices — those relating to the use of an incorrect discount rate and improper accretion methodology — as violations of what they call "prescriptive" — as opposed to "judgment-based" — rules.  Am. Compl. ¶¶ 2, 32, 33.  But SC's restatements show that those errors had virtually no impact on the income overstatements in the fourth quarter of 2014 and first quarter of 2015 on which plaintiffs pin their claim.  *Compare* Ex. E at App. 46, 48, *with* Ex. I at App. 139.

2017) ("allegations of mismanagement, even gross mismanagement, do not establish a strong inference of scienter").  The remainder of the disclosed internal control weaknesses, including a lack of adequate personnel and failure to properly document accounting policies, likewise support at most "an inference of potentially poor accounting management, [but] do[] not support fraud."  *In re Magnum Hunter*, 26 F. Supp. 3d at 297-98.  *See also In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, at *9 (D. Ariz. July 5, 2006) (internal control weaknesses related to staffing, oversight of financial reporting, and documentation not probative of scienter; "[p]resumably every company that issues a financial restatement because of GAAP errors will cite as the reason a lack of effective internal controls").

What is more, plaintiffs barely attempt to connect the internal control weaknesses to any of the alleged misrepresentations; rather, they broadly allege that the "existence of these material weaknesses enabled the Defendants to circumvent the Company's accounting policies."  Am. Compl. ¶ 86.  Missing from this vague and conclusory allegation is any explanation of who did the circumventing, how it was accomplished, or which particular material weakness "enabled" the circumvention of any particular "accounting policies."  *See Cent. Laborers'*, 497 F.3d at 555 (no scienter where complaint "does not clearly explain the link between . . . statements about the internal controls and the actual accounting and reporting problems that arose"); *Ind. Elec.*, 537 F.3d at 538-39.  In short, the amended complaint "fails miserably in explaining how [SC's] internal control problems" amount to fraud.  *In re Impac*, 554 F. Supp. 2d at 1101.[5]

---

[5]     Notably, Plaintiffs do not allege that SC's internal controls were defective during the fourth quarter of 2014 or first quarter of 2015, the reporting periods highlighted in the amended complaint.  Plaintiffs allege only that SC disclosed internal controls weaknesses as of December 31, 2015.  Am. Compl. ¶ 85; *see* Ex. E at App. 49.  As courts have held, that does not establish that SC's internal controls were ineffective in late 2014 or early 2015.  *See Cent. Laborers'*, 497 F.3d at 555 (SOX certifications did not support scienter where there was no "allegation that on the particular date the certifications were made, the internal controls . . . were inadequate"); *In re*

**E.      Plaintiffs' allegations of "motive and opportunity" are insufficient.**

Plaintiffs' primary argument for pleading scienter is based on allegations concerning the timing of defendant Tom Dundon's departure from the company and his agreement to sell his stock in SC to SC's parent company, SHUSA.  Am. Compl. ¶¶ 4, 19-20, 34, 67, 103-15.  As alleged, on July 2, 2015, SC announced that Dundon was resigning as SC's Chairman and CEO but would continue to serve as a director of and consultant to the company.  *Id.* ¶¶ 67, 105.  Dundon and SC entered into a Separation Agreement on the day of his departure.  *Id.*  Under that agreement and a Shareholders Agreement from January 2014 between SHUSA and Dundon, SHUSA exercised an option to purchase Dundon's 10% stake in SC after he resigned.  *Id.* ¶¶ 4, 108-09.  That Shareholders Agreement set the terms of the call option mechanism by which SHUSA ultimately agreed to purchase Dundon's shares.  *Id.* ¶ 108.

Although it is "not unusual for individuals leaving a company, like [Dundon], to sell shares," *Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999), plaintiffs speculate that SHUSA's exercise of the call option must have "motivated" Dundon to inflate SC's stock price, Am. Compl. ¶ 113.  But the Fifth Circuit holds that so-called "motive and opportunity" allegations such as these are not an independent basis for pleading scienter and, at best, only serve to "enhance the strength" of an already existing inference.  *E.g.*, *Local 731*, 810 F.3d at 957-59; *Ind. Elec.*, 537 F.3d at 533.  As discussed above, plaintiffs have failed to create such an inference, strong or otherwise, making their motive and opportunity allegations irrelevant.  *See*

---

*Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 354 (D.N.J. 2007) (fact that internal controls existing during class period "were eventually deemed insufficient" offered "no support" to claim that defendants were aware of deficiencies or ignored any red flags when misstatements were made).  Plaintiffs' argument is also undermined by Deloitte's contemporaneous opinion that SC "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014."  Ex. G at App. 90.

*Berger* v. *Beletic*, 248 F. Supp. 2d 597, 605-06 (N.D. Tex. 2003) (dismissal required because scienter allegations consisted solely of motive and opportunity).

And under Fifth Circuit law, Dundon's resignation for "personal reasons" after his lengthy tenure with the company does not support scienter. Am. Compl. ¶ 111; *Abrams*, 292 F.3d at 434 (resignation to "pursue other interests" has no scienter implications). That is especially true given that Dundon was retained by SC as a consultant following his resignation and remained on its board of directors. *See In re Cyberonics Inc. Sec. Litig.*, 523 F. Supp. 2d 547, 553-54 (S.D. Tex. 2007) (no scienter where "[t]he resignation agreements with the CEO and CFO contain no particularized details that would support a strong inference of scienter" and where board chairman "spoke well of both people and went so far as to retain the CFO as a consultant for the company").

In any event, plaintiffs' motive and opportunity theory regarding Dundon is illogical and utterly devoid of factual support. As discussed above, the accounting methodologies that led to the errors in reported net income: (1) were in place long before SC became a public company and Dundon entered into the Shareholders Agreement with SHUSA; (2) were first revealed nearly nine months after Dundon resigned; (3) led to overstatements and understatements of net income in different reporting periods; and (4) had only a modest impact on overall earnings once corrected. Thus, under plaintiffs' theory, the Court would have to draw a series of highly implausible inferences, including that Dundon put the legacy accounting methodology in place years before SC was a public company in anticipation of SC's IPO and a future deal with SC's parent in which his stock might get called at the public market price. And the Court would have to further infer that Dundon had the foresight to predict in early 2014 that maintaining the existing accounting methodologies, while understating net income in the three years prior to

SC's IPO, would eventually lead to income overstatements in specific quarters that he could time in connection with an as yet undetermined departure date.

Of course, there is no factual support in the complaint for any of this.  Plaintiffs have alleged no facts to suggest that Dundon was personally involved in selecting the accounting methodology for handling loan losses, let alone that Dundon was anticipating a change in that methodology when he resigned.  Nor do plaintiffs explain how Dundon could have persuaded SC's internal accountants or Deloitte to endorse an accounting approach for calculating loan losses that they believed to be incorrect.  As courts have recognized, a "CEO's responsibility to oversee the business does not demonstrate his involvement in accounting determinations."  *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *see also Oklahoma Firefighters Pension & Ret. Sys.* v. *IXIA*, 50 F. Supp. 3d 1328, 1363 (C.D. Cal. 2014) ("allegation 'that any competent accounting professional . . . would have known the correct rules to apply' is not probative of scienter, since none of the individual defendants is alleged to be an accounting professional").

Plaintiffs also fail to plead any facts to explain in any sort of cogent or compelling fashion why the other individual defendants would have gone along with the alleged scheme. Plaintiffs name three successive SC CFOs as defendants (Kulas, Davis, and Dawood), two of whom did not take on that role until after Dundon resigned, and one of whom (Dawood) did not even join the company until *nearly six months* after Dundon left.  Not surprisingly, these defendants are barely mentioned in the amended complaint.  For example, Dawood is only referenced by name twice:  once to say that he has served as SC's CFO since December 16, 2015, and once to note that he is among those included in the amended complaint's defined term "Individual Defendants."  Am. Compl. ¶¶ 13, 16.  Plaintiffs, moreover, do not allege that any of

-21-

the defendant CFOs profited from the alleged scheme, thus undermining any inference of fraud. *See Local 731*, 810 F.3d at 960 (significant sale by one insider does not give rise to scienter where "other defendants do not sell some or all of their shares during the Class Period"); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) ("a significant stock sale by just one corporate insider is insufficient" to support an inference of scienter).

*          *          *

For these reasons, plaintiffs' securities fraud claims must be dismissed under the PSLRA and clear Fifth Circuit precedent. Plaintiffs have failed to come forward with any particularized allegations establishing a strong inference of scienter.

## II.    THE SECTION 10(B) CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION.

To meet their loss causation burden, plaintiffs must "connect the alleged misrepresentations with correlative corrective disclosures" during the class period. *Magruder* v. *Halliburton Co.*, 2009 WL 854656, at *15 (N.D. Tex. Mar. 31, 2009) (dismissing securities fraud claim premised on accounting errors for failure to adequately plead loss causation); *see* 15 U.S.C. § 78u-4(b)(4); *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228, 260 (5th Cir. 2009). "A corrective disclosure, at a minimum, requires that the prior misrepresentation be identified, and that the fraud of the prior representation be revealed to the market, which subsequently reacts by adjusting the stock price." *Magruder*, 2009 WL 854656, at *15. Plaintiffs have not met their burden because none of the alleged corrective disclosures "revealed the falsity of [] previous representations" in SC's financial statements. *Catogas* v. *Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) (affirming dismissal of securities fraud claim premised on accounting errors for failure to adequately plead loss causation).

-22-

Plaintiffs' core contention is that defendants artificially inflated SC's stock price by fraudulently overstating net income in the fourth quarter of 2014 and first quarter of 2015.  *See, e.g.*, Am. Compl. ¶ 3.  SC first revealed that earnings had been overstated in those periods on March 31, 2016, when SC changed its accounting methodology for calculating loan losses and corrected financial results dating back to 2011 in its 2015 Form 10-K.  *See id.* ¶ 76; Ex. E at App. 42, 52-56.  Later, on October 27, 2016, SC made additional corrections to its accounting methodology and restated financial results going back to 2011.  *See* Am. Compl. ¶ 76.  Yet plaintiffs do not claim to have suffered any loss on either of those days.  That is unsurprising, as SC's stock went up $1.59 following the March 31 disclosure and only dropped six cents following the October 27 disclosure.  *See* Ex. D. at App. 34, 38.

Instead, plaintiffs make a tortured attempt at connecting Dundon's resignation as CEO and Chairman to the alleged misrepresentations and claim that SC somehow "corrected" its earnings two weeks before presenting any revised financial results and over eight months before the company's full restatement.  This attempt must be rejected.

On July 6, 2015, the first trading day following Dundon's resignation, SCUSA's stock dropped $2.19.  Am. Compl. ¶ 68.  The problem with trying to claim loss causation based on this disclosure is obvious:  it had nothing to do with SC's financial statements or the alleged accounting errors.  SC did not correct *any* of the alleged accounting errors in its financial statements until nearly *nine months* later.  *Id.* ¶¶ 70, 76, 91.  And SC did not make the additional changes to its accounting methodology until *over a year* after Dundon resigned.  *Id.* ¶¶ 74-76. When SC disclosed these changes, it did so in plain language, informing the market in Form 10-K and Form 10-Q filings that it had "identified errors in its historical financial statements" and "restated the . . . consolidated financial statements . . . to reflect the error corrections."  *Id.*

Rather than accept the common sense proposition that the corrective disclosures occurred when SC disclosed the corrections, plaintiffs assert that the July 6 drop reflected the market's "speculation" that Dundon's departure "may" have indicated some unspecified "issue" with SC's "financial position." *Id.* ¶ 69. This allegation is so vague as to be meaningless, and "this type of speculation cannot form the basis of a viable loss causation theory." *Loos* v. *Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014) (affirming dismissal of securities fraud claim premised on accounting errors because plaintiffs did not "plausibly allege" that the alleged fraud was "revealed to the market and caused the resulting losses"). At best, plaintiffs claim a loss caused "solely by a general impression in the market that 'something [was] wrong,'" which is "insufficient to establish causation." *N. Port Firefighters' Pension-Local Option Plan* v. *Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 761 (N.D. Tex. 2013) (dismissing securities fraud claim premised on accounting errors for failure to make "facially plausible" allegations of loss causation).

Plaintiffs' second alleged corrective disclosure fares no better. On March 15, 2016, SC filed a Form 8-K disclosing that: (1) it would delay filing its 2015 Form 10-K; (2) it had an open comment letter from the SEC regarding its calculation of loss reserves and TDR methodology; (3) it would change its method of estimating its credit loss allowance on RICs; (4) it would "correct prior periods" in its upcoming Form 10-K; and (5) its failure to file Form 10-K caused SC to be out of compliance with the New York Stock Exchange's Rule 8.01E. Am. Compl. ¶ 71. That day, SC's stock price fell 95 cents, from $10.70 to $9.75. *See* Ex. D at App. 34.

Most of this information, however, had already been disclosed two weeks earlier to no market reaction. On February 29, 2016, after the market closed, SC filed a Form NT 10-K announcing that it would delay filing its Form 10-K due to an open comment letter from the SEC

regarding its TDR methodology.  Am. Compl. ¶ 70.  The next day, SC's stock dropped one cent.  *See* Ex. D at App. 34.  It is well settled "that information already known to the market [] may *not* constitute . . . a corrective disclosure."  *Catogas*, 292 F. App'x at 314.

The only new information released in the March 15 Form 8-K was that SC would be changing its methodology for estimating its loss allowance and would restate prior periods.  But that information did not reveal the income overstatements at the heart of plaintiffs' complaint.  SC did not inform investors what the changes to the methodology would be, what items would be corrected, or how those corrections would affect SC's balance sheet.  Accordingly, "this disclosure 'does not correct and reveal the truth of the previously misleading statement' and is therefore insufficient to allege loss causation."  *N. Port Firefighters'*, 936 F. Supp. 2d at 763.  SC did not disclose the income overstatements until it filed its 2015 Form 10-K two weeks later.  When SC did, its stock price *increased* by \$1.59, more than making up for the 95-cent decline on March 15.  *See* Ex. D at App. 34.  That price increase is completely inconsistent with plaintiffs' loss causation theory.

## III.   THE "CONTROL PERSON" CLAIMS MUST BE DISMISSED.

Plaintiffs also assert claims under Section 20(a) of the Exchange Act.  That provision imposes liability on those who "controlled" any person liable for a primary violation of the relevant securities laws.  *See* 15 U.S.C. § 78t(a).  Because plaintiffs have not pled primary violations of the Exchange Act, the control person claims must be dismissed.  *See Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation."); *Schott*, 2016 WL 5539756, at *14.

## CONCLUSION

For the foregoing reasons, plaintiffs have failed to state a claim for securities fraud.  The amended complaint should be dismissed in its entirety and with prejudice.

Dated:  March 14, 2017                    Respectfully Submitted,

                                          */s/ R. Thaddeus Behrens*                        
                                          R. Thaddeus Behrens
                                          Texas Bar No. 24029440
                                          thad.behrens@haynesboone.com
                                          Daniel H. Gold
                                          Texas Bar No. 24053230
                                          daniel.gold@haynesboone.com
                                          Matthew A. McGee
                                          Texas Bar No. 24062527
                                          matt.mcgee@haynesboone.com
                                          HAYNES AND BOONE, LLP
                                          2323 Victory Avenue, Suite 700
                                          Dallas, TX  75219
                                          214-651-5000 (telephone)
                                          214-200-0886 (facsimile)

                                          Stephen R. DiPrima (*pro hac vice*)
                                          SRDiPrima@wlrk.com
                                          David B. Anders (*pro hac vice*)
                                          DBAnders@wlrk.com
                                          Nathaniel D. Cullerton (*pro hac vice*)
                                          NDCullerton@wlrk.com
                                          Corey J. Banks (*pro hac vice*)
                                          CJBanks@wlrk.com
                                          WACHTELL, LIPTON, ROSEN & KATZ
                                          51 West 52nd Street
                                          New York, NY  10019
                                          212-403-1000 (telephone)
                                          212-403-2000 (facsimile)

                                          *Attorneys for Defendants Santander Consumer*
                                          *USA Holdings Inc., Thomas G. Dundon, Jason*
                                          *Kulas, Ismail Dawood, and Jennifer Davis*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served upon counsel of record through the Court's ECF system on March 14, 2017.


*/s/ R. Thaddeus Behrens*
R. Thaddeus Behrens