**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| CYNTHIA A. PARMELEE, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  v.<br><br>SANTANDER CONSUMER USA HOLDINGS INC., THOMAS G. DUNDON, ISMAIL DAWOOD, JASON KULAS, and JENNIFER DAVIS,<br><br>     Defendants. | Case No. 3:16-CV-00783-K |

**<u>LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ....................................................................... 1

II.     SUMMARY OF FACTS ................................................................................ 3

III.    ARGUMENT .................................................................................................. 6

      A.    Applicable Legal Standards Disfavor Defendants' Motion ...................... 6

      B.    The Complaint Alleges A Strong Inference of Scienter ........................... 6

             1.    Dundon's Perfectly Timed Departure And The Inflated Price Of His Cash Out Deal Support A Strong Inference Of Scienter .................................... 7

             2.    The Facts And Circumstances Of The Restatements Support Scienter .... 12

                    (a)    The Magnitude, Timing, And Pattern Of SCUSA's Restatements Support A Strong Inference Of Scienter ...................................... 12

                    (b)    The Nature Of The Accounting Errors And Defendants' Restatement Disclosures Indicate Scienter ................................... 16

             3.    Additional Factors Bolster The Already Strong Inference Of Scienter .... 19

      C.    The Complaint Adequately Alleges Loss Causation ............................... 20

IV.   CONCLUSION ............................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. Baker Hughes, Inc.*,
   292 F.3d 424 (5th Cir. 2002) ................................................. 10

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ................................................. 21, 22, 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................. 6

*Bachow v. Swank Energy Income Advisors, LP*,
   2010 WL 70520 (N.D. Tex. Jan. 6, 2010) ............................ 7

*Batwin v. Occam Networks, Inc.*,
   2008 WL 2676364 (C.D. Cal. July 1, 2008) ........................ 20

*Brody v. Zix Corp.*,
   2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ..................... 8

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
   497 F.3d 546 (5th Cir. 2007) ................................................. 10, 12

*Chalverus v. Pegasystems, Inc.*,
   59 F. Supp. 2d 226 (D. Mass. 1999) ..................................... 16

*Dorsey v. Portfolio Equities, Inc.*,
   540 F.3d 333 (5th Cir. 2008) ................................................. 19, 20

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................. 21

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ................................................. 8

*Gelfer v. Pegasystems, Inc.*,
   96 F. Supp. 2d 10 (D. Mass. 2000) ...................................... 20, 22

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ........................ 16

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ....................................................... 12, 13, 14

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)............................................................................ 11, 16

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................................................... 19

*In re Bally Total Fitness Sec. Litig.*,
2006 WL 3714708 (N.D. Ill. July 12, 2006)......................................................................... 14

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) ........................................................................................ 25

*In re Carter's Inc. Sec. Litig.*,
2012 WL 3715241 (N.D. Ga. Aug. 28, 2012) ....................................................................... 13

*In re Crossroads Systems, Inc. Sec. Litig.*,
2001 WL 1401211 (W.D. Tex. Aug. 15, 2001)....................................................................... 8

*In re Fleming Companies Inc. Sec. & Derivative Litig.*,
2004 WL 5278716 (E.D. Tex. June 10, 2004).................................................................. 12, 17

*In re Medicis Pharm. Corp. Sec. Litig.*,
2010 WL 3154863 (D. Ariz. Aug. 9, 2010)...................................................................... 15, 16

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................................................... 17

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................................. 16

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
988 F. Supp. 2d 406 (S.D.N.Y. 2013)..................................................................................... 19

*In re Orbital Sci. Corp. Sec. Litig.*,
58 F. Supp. 2d 682 (E.D. Va. 1999) .................................................................................... 8, 9

*In re Seitel, Inc. Sec. Litig.*,
447 F. Supp. 2d 693 (S.D. Tex. 2006) .................................................................................... 25

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)................................................................................................... 10

358349.1 SANTANDER2016

*In re Triton Energy Ltd. Sec. Litig.*,
  2001 WL 872019 (E.D. Tex. Mar. 30, 2001) ............................................................ 12

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................... 8, 9, 20, 25

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ............................................................................ 10, 14

*Kaltman v. Key Energy Servs., Inc.*,
  447 F. Supp. 2d 648 (W.D. Tex. 2006) ..................................................................... 12

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ................................................................................. 23

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ...................................................................................... 9

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................................. 6, 7

*Lovick v. Ritemoney, Ltd.*,
  378 F.3d 433 (5th Cir. 2004) ...................................................................................... 6

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) ........................................................................ 11

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
  929 F. Supp. 2d 740 (M.D. Tenn. 2013) .................................................................. 13

*Norfolk Cnty. Ret. Sys. v. Ustian*,
  2009 WL 2386156 (N.D. Ill. July 28, 2009) ...................................................... 13, 20

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) .................................................................................... 10

*Patel v. Axesstel*,
  2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ............................................................ 12

*Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*,
  499 F. App'x 345 (5th Cir. 2012) ............................................................................ 10

*Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ........................................................................ 21, 22, 23

*Richard v. Northwest Pipe Co.*,
  2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ................................................... 25

*Rubinstein v. Collins,*
  20 F.3d 160 (5th Cir. 1994) ........................................................................................ 7

*Schleicher v. Wendt*,
  529 F. Supp. 2d 959 (S.D. Ind. 2007) ...................................................................... 16

*Schott v. Nobilis Health Corp.*,
  2016 WL 5539756 (S.D. Tex. Sept. 29, 2016) .................................................. 14, 22

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ...................................................................................... 7

*Stone v. Life Partners Holdings, Inc.*,
  26 F. Supp. 3d 575 (W.D. Tex. 2014) ........................................................................ 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................................... 7

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................... 15

*United States ex rel. Adrian v. Regents of the Univ. of Cal.*,
  363 F.3d 398 (5th Cir. 2004) .................................................................................... 25

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 6

358349.1 SANTANDER2016

Lead Plaintiffs Cynthia Parmelee and Kelly Baxley (together, "Plaintiffs"), respectfully submit this opposition to Defendants'[1] motion to dismiss.[2]

## I.      PRELIMINARY STATEMENT

Plaintiffs' Amended Class Action Complaint (the "Complaint") details a massive fraud surrounding SCUSA's accounting for troubled debt restructurings ("TDRs"), which led SCUSA to understate its allowance for credit losses and overstate net income during critical portions of the Class Period.[3] SCUSA issued restatements on March 31, 2016 and October 26, 2017 (together, the "Restatements"), admitting that its financial reporting was materially false. Defendants, therefore, do not dispute either the falsity or the materiality elements of Plaintiffs' claims and instead only contest the elements of scienter and loss causation.

With respect to scienter, two critical facts should guide the Court's analysis. First, the Restatements revealed that SCUSA's net income was significantly overstated in the fourth quarter of 2014 ("Q4 14") and the first quarter of 2015 ("Q1 15"), the two quarters preceding Dundon's resignation as CEO.[4] Second, upon his departure, SCUSA approved a deal to pay Dundon *$928 million* for his shares in the Company, at a price that was artificially inflated by the very accounting errors that gave rise to the Restatements.

Defendants argue that the foregoing facts are unrelated, and that it was merely a coincidence that Dundon happened to exit the Company at a time when net income was drastically overstated, at the highest trading price of SCUSA's stock in the entire history of the

---

[1] "Defendants" means Santander Consumer USA Holdings Inc. ("SCUSA" or "Company"), Thomas Dundon ("Dundon"), Ismail Dawood ("Dawood"), Jason Kulas ("Kulas"), and Jennifer Davis ("Davis").

[2] Defendants' brief in support of their motion (Dkt. No. 44) is cited herein as "DB."

[3] The Class Period is February 3, 2015 to March 15, 2016, inclusive. References to the Complaint are set forth as "¶__" herein. Unless otherwise noted, all emphasis in this brief is added and internal quotation marks, citations and brackets are omitted.

[4] Dundon resigned after Q2 15, but prior to the release of results for that quarter.

Company. Defendants also claim that the "up and down" nature of the Restatements, which covered a five year span and indicated that net income was overstated in certain periods while understated in others, demonstrates the innocent nature of the accounting errors.

But a close examination of the Restatements indicates a pattern that is far from innocent. The overstatements of net income were heavily concentrated in the final two quarterly financials issued prior to Dundon's departure. For the six months encompassed by Q4 14 and Q1 15, net income was overstated by more than 35%, while TDR impairment was consistently understated, in an amount ranging from 44% to 68%, for each of the six quarters before Dundon resigned.

The nature of the accounting errors also is highly suggestive of fraud. Defendants' errors involved both (i) violations of prescriptive GAAP rules concerning the discount rate and accretion methodology for TDR impairment and (ii) unexplained errors in identifying TDRs that violated both GAAP and *the Company's own accounting policies*. Defendants repeatedly suggest that SCUSA's "legacy accounting methodology," while incorrect, was at least honestly and consistently applied, but the fact that the errors in TDR identification were admitted violations of the Company's own purported policies strongly undercuts that notion.

With respect to loss causation, Defendants argue that their false statements did not cause losses to Plaintiffs or the Class, because SCUSA's stock price moderately increased when Defendants announced the March 31, 2016 restatement. But Defendants' argument ignores the fact that by March 31, 2016, SCUSA's stock price had been battered by a series of partial corrective disclosures that had already removed the effects of the fraud from SCUSA's stock price. Defendants also ignore binding Fifth Circuit precedent that requires courts to evaluate corrective disclosures in tandem with each other, rather than as isolated, self-contained events.

In sum, the Complaint more than satisfies the applicable pleading standards for each

element of a securities fraud claim, and Defendants' motion should be denied in its entirety.

## II.   SUMMARY OF FACTS

SCUSA is a consumer finance company focused on vehicle finance and unsecured consumer lending products. ¶2. Defendants do not dispute that throughout the Class Period, they issued materially false statements. ¶73.

The Class Period begins on February 3, 2015, when SCUSA released its financial results for Q4 14 and fiscal year 2014 ("FY 14"). ¶35. Dundon represented that the Q4 14 results were "highlighted by strong profitability," as SCUSA reported net income of $247 million. ¶37. In response, SCUSA's stock price climbed by 7.2% and continued to rise over the next two weeks, increasing by as much as 20.4% over the price immediately before the Class Period.[5] Unbeknownst to investors though, Defendants had overstated Q4 14 net income by 61.8%. ¶38

On April 28, 2015, SCUSA released its financial results for Q1 15. ¶¶47-49. Defendants reported net income of $289 million, which overstated SCUSA's net income for Q1 15 by 19.3%. ¶50. In response, SCUSA's stock price climbed 4.3% to $24.00.[6] The price continued to trade at record high levels, eventually reaching an all-time high of $26.83 on June 22, 2015.[7]

By reporting massive overstatements of SCUSA's net income for Q4 14 and Q1 15 (¶¶41, 50), Defendants artificially inflated the price of SCUSA's stock to historically high levels during the early portion of the Class Period. ¶3. Dundon took advantage of this inflated stock price to negotiate his July 2, 2015 exit from SCUSA at a price—approximately $928 million— that allowed him to cash out his substantial ownership interest in SCUSA at the highest intraday trading price in the Company's history. ¶¶103, 112-14. As a result, Dundon obtained a price for

---

[5] *See* Defendants' Appendix ("Def. App.") (Dkt. No. 45), Ex. D at App. 28.

[6] *See* Def. App., Ex. D at App. 29.

[7] *See id.* at App. 29-30.

his interest that exceeded by roughly $283 million the price he would have received had he cashed out his position prior to SCUSA's announcements of the materially overstated financial results just a few months earlier. ¶¶103, 114.

During the July 2, 2015 conference call in which Defendants discussed Dundon's exit, new CEO Kulas attempted to reassure analysts that Dundon's resignation was unrelated to any issue with SCUSA's financial performance. ¶111. Nonetheless, the market speculated that Dundon's resignation indicated an undisclosed issue regarding SCUSA's financial position, and the stock price fell by $2.19 per share, or 8.4%, to close at $24.01. ¶¶68-69.

On October 29, 2015, SCUSA announced its results for the third quarter of 2015 ("Q3 15"). ¶58. The results for Q3 15 reflected an increase in reported TDR impairment of more than $434 million. *See infra* at 15. That giant bump in TDR impairment both dragged down the results for the quarter and acted to correct a substantial understatement of TDR impairment during the six prior quarters. As a result, SCUSA's stock price dropped 15.6%.[8]

On February 29, 2016, SCUSA filed a report with the SEC announcing that it would file its 2015 annual report late. ¶70. SCUSA stated that it had an open comment letter from the SEC with respect to its "credit loss allowance, including the removal of seasonality and the increase in [TDR] impairment during [Q3 15] as well as certain TDR disclosures in [FY 14 and Q3 15]," thereby foretelling their subsequent disclosure of widespread accounting errors. *See* ¶¶70, 72-77.

On March 15, 2016, SCUSA admitted that its prior financial reports filed with the SEC contained materially false statements as to its income. Defendants announced that they would be "changing [SCUSA's] methodology for estimating credit loss allowance on individually acquired retail installment contracts" and would "correct prior periods in Item 9B in the Form 10-K." ¶71.

---

[8] *See id.* at App. 32.

By the close of market the next day, SCUSA's stock price had dropped $1.70, or 16%. ¶72.

On March 31, 2016, the Company filed its Form 10-K for fiscal year 2015 ("FY 15"), which restated its previously reported financial results for fiscal years 2011-2015.[9] The Form 10-K disclosed that SCUSA had erred in estimating its credit loss allowance for individually acquired retail installment contracts held for investment, purportedly because "it did not estimate impairment on [TDRs] separately from a general credit loss allowance on loans not classified as TDRs, and incorrectly applied a loss emergence period to the entire portfolio rather than only to loans not classified as TDRs." ¶76. In addition, SCUSA stated that "it had incorrectly identified the population of loans that should be classified and disclosed as TDRs and, separately, had incorrectly estimated the impairment on these loans." *Id.*

On September 23, 2016, SCUSA issued a press release announcing that it would be "restating financial statements and associated disclosures for the full years 2013, 2014 and 2015, and the quarters within 2014 and 2015, as well as the first quarter of 2016, due to errors identified in the financial statements for each of those periods." ¶73. Defendants explained that the restatements were "primarily being made to correct errors associated with" SCUSA's (i) "methodology for accreting dealer discounts, subvention payments from manufacturers and capitalized origination costs;" (ii) "lack of consideration of net discounts when estimating the allowance for credit losses;" and (iii) "the discount rate used in determining the impairment for loans accounted for as [TDRs]." ¶73.

On October 27, 2016, after the market close, SCUSA filed its quarterly report for Q2 2016, its amended quarterly reports for the first, second, and third quarters of 2015, its amended annual report for FY 15, and its amended quarterly report for Q1 2016. ¶74. According to a press

_____
[9] *See* ¶¶43, 76; *see also* Def. App., Ex. E at App. 50.

release issued the same date, the restated filings "correct[ed] all known errors in the respective filings, the most significant of which" were SCUSA's (i) "methodology for accreting dealer discounts, subvention payments from manufacturers and capitalized origination costs;" (ii) "lack of consideration of net discounts when estimating the allowance for credit losses;" and (iii) "the discount rate used in determining the impairment for loans accounted for as troubled debt restructurings." ¶74. SCUSA also included "[a] description of all material weaknesses" in the Q2 16 Form 10-Q, each of the Form 10-Q/As, and the FY 15 Form 10-K/A. ¶75.

The effects of Restatements on net income and TDR impairment are discussed below.

## III.   ARGUMENT

### A.   Applicable Legal Standards Disfavor Defendants' Motion

In the Fifth Circuit, motions to dismiss under Fed. R. Civ. P. 12(b)(6) "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). In considering a Rule 12(b)(6) motion, the Court must accept all allegations in the Complaint as true, construing them in the light most favorable to and drawing all reasonable inferences in favor of Plaintiffs. *Lovick v. Ritemoney, Ltd.,* 378 F.3d 433, 437 (5th Cir. 2004). The Complaint's allegations need only "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While the Exchange Act heightens the pleading requirement with respect to scienter, it does not alter "the usual contours of a Rule 12(b)(6) ruling" for any other element of a Rule 10b-5 claim.  *Lormand*, 565 F.3d at 239.

### B.   The Complaint Alleges A Strong Inference of Scienter

Scienter is satisfied by alleging that Defendants acted with either an "intent to deceive, manipulate, or defraud" or "severe recklessness," *i.e.*, "an extreme departure from the standards of ordinary care ... that presents a danger of misleading buyers or sellers which is either known to

the defendant or is so obvious that the defendant must have been aware of it." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). While Plaintiffs must allege  a "'strong'—*i.e.* a powerful or cogent—inference" of scienter, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the Fifth Circuit has held that "[a]llegations of circumstantial evidence … will suffice" in establishing that inference. *Lormand*, 565 F.3d at 251.

An inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Rather, scienter is adequately alleged where "a reasonable person would deem the plausible inference of scienter cogent and at least as strong as any opposing inference one could draw from the facts alleged." *Lormand*, 565 F.3d at 252. Thus, "a tie favors the plaintiff." *Id.*

Finally, the scienter inquiry is holistic: it is "whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 251. Applying these principles here, a reasonable person would deem the inference of scienter drawn from the facts alleged in the Complaint as cogent and *at least* as compelling as any opposing inference.

### 1.    Dundon's Perfectly Timed Departure And The Inflated Price Of His Cash Out Deal Support A Strong Inference Of Scienter

The Fifth Circuit has held that "[i]nsider trading in suspicious amounts or at suspicious times, is, of course, presumptively probative of bad faith and scienter." *Rubinstein v. Collins,* 20 F.3d 160, 169 (5th Cir. 1994); *see also Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 606 (W.D. Tex. 2014) (CEO's sales of approximately 30% of his shares during class period raised strong inference of scienter: "to sell such a large portion of one's share in a company after receiving ... clues that the company may not be sustainable is highly suspicious").[10]

---

[10] *See also Bachow v. Swank Energy Income Advisors, LP*, 2010 WL 70520, at *6-7 (N.D. Tex.

The inference of scienter to be drawn from suspicious insider trading is especially strong in cases where a company's price was artificially inflated through GAAP violations at the times the defendants made the suspicious trades. *See, e.g.*, *In re Crossroads Systems, Inc. Sec. Litig.*, 2001 WL 1401211, at *4 (W.D. Tex. Aug. 15, 2001) (GAAP violations to create appearance of better financial performance, combined with motive to inflate stock price in advance of insider sales, give rise to a strong inference of scienter).[11] The inference is stronger still where the size of a company's restatement and the size of the insider sales are both substantial in magnitude. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (strong inference of scienter where company restated $400 million in revenue and defendants collectively received proceeds of $40 million in insider sales during the class period).[12]

The facts here concerning the timing and the price of Dundon's negotiated departure deal raise a very strong inference of scienter.  When Dundon negotiated his Separation Agreement and the amendment to the Shareholders Agreement that would allow him to cash out his position in the Company for more than $928 million,[13] the Company's stock price was significantly inflated by the overstatements of net income in Q4 14 and Q1 15. For the six month period covered by these quarters, SCUSA's net income was overstated by more than $140 million, or

---

Jan. 6, 2010); *Brody v. Zix Corp.*, 2006 WL 2739352, at *6-7 (N.D. Tex. Sept. 26, 2006).

[11] *See also In re Orbital Sci. Corp. Sec. Litig.*, 58 F. Supp. 2d 682, 686-87 (E.D. Va. 1999) ("the fact that [the CEO] and [the CFO] so fortuitously profited from the GAAP violations before [the company] revealed them strongly suggests the requisite intentionality").

[12] *Cf. Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) ("the magnitude of [the CEO's] compensation package [$102 million], together with the timing coincidence of an overstatement of earnings at just the right time to benefit [the CEO], provides an unusual, heightened showing of motive to commit fraud").

[13] Dundon has not received the money yet, because payment has been held up by regulators. *See* ¶115; *see also* Plaintiffs' Appendix ("Pl. App."), Ex. H (Form 10-K/A filed March 2, 2017). As Defendants note in their brief, on this motion to dismiss, this Court may take judicial notice of documents attached to or referred to in the Complaint or relevant SEC filings. *See* Defendants' Brief ("DB") at 5 n.2.

35.7%. The $26.83 price at which Dundon and the Company agreed to exchange his shares represented a 44% premium over the $18.63 price that SCUSA's stock closed at the day before the misleading Q4 14 results were released and represented not only the Class Period high and 52-week high, but the highest intraday trading price in the Company's history. Had Dundon cashed out at the $18.63 price immediately preceding the Class Period, he would have received $645 million, roughly $283 million less than the amount the Company agreed to pay him. The enormous size of Dundon's expected payout, combined with the fact that it was at the absolute peak price, give rise to a strong inference of scienter.

Defendants argue that motive allegations, ***standing alone***, are insufficient to plead scienter. *See* DB 19; *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016) ("[I]nsider trading, ***by itself***, cannot create a strong inference of scienter, but it may ***meaningfully enhance*** the strength of the inference of scienter."). But here the motive allegations do not stand alone and instead are accompanied by allegations of violations of prescriptive GAAP rules and SCUSA's own accounting policies, timed to coincide perfectly with Dundon's departure so as to maximize his cash out price. *See infra* at 12-18. When, as here, a restatement is combined with substantial insider trading that allows insiders to profit from their own misstatements, the inference of scienter is compelling. *See, e.g.*, *Orbital*, 58 F. Supp. 2d at 686-87; *UTStarcom*, 617 F. Supp. 2d at 976.

In support of their argument, Defendants cite a number of inapposite decisions that did not address anything close to the compelling situation here. DB 11, 19. For example, the Fifth Circuit's decision in *Local 731* did not involve any restatement, or even any alleged GAAP violations. 810 F.3d at 960 n.3. By contrast, in most of Defendants' cited cases, either there were no insider trading allegations, or the court found the trades not to be suspicious in timing or

amount. *See Owens v. Jastrow*, 789 F.3d 529 (5th Cir. 2015) (no trading alleged); *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345 (5th Cir. 2012) (same); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 543-44 (5th Cir. 2008) (sales at $20 below market high not suspicious); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) (sale of 17% of holdings, not alleged to have occurred "at times calculated to maximize personal profit," not suspicious).[14]

Defendants also argue that Dundon's decision to cash out his position was not suspicious because "it is not unusual for individuals leaving a company … to sell shares." DB 19. But it was Dundon's decision alone to step down and cash out when TDR impairment was understated, net income was overstated, and SCUSA stock was trading at record highs. It is certainly suspicious that Dundon chose to leave SCUSA at the exact moment when he could maximize his windfall. Analysts, taken aback by the timing of Dundon's resignation, wondered aloud whether the move signaled an underlying issue with SCUSA's performance. ¶111. Defendant Kulas's explanation that Dundon wanted "to monetize his interest in the company" did not reassure investors, as SCUSA's stock price dropped significantly on the news. ¶¶68, 111. If anything, Dundon's abrupt decision to resign bolsters the inference of scienter in this case. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) ("The timing of the sales were also suspect in that they occurred just six weeks before [individual defendants] resigned.").

Finally, Defendants contend that any inference of scienter is negated by the Complaint's

---

[14] In *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007),the Fifth Circuit held that one individual defendant's sales were suspicious, but concluded that the facts as a whole did not establish a strong inference of scienter because the plaintiff failed "to link the misstatements with the bases for inferring scienter." 497 F.3d at 555. In this case, however, the Complaint alleges particularized facts linking the timing of the misstatements with the pricing of Dundon's cash out. Moreover, the $928 million Dundon stood to gain dwarfs the $1.44 million earned by the insider in *Central Laborers'*.

failure to allege that any of the three CFO Defendants engaged in any suspicious trades. DB 22. But Dawood owned no tradeable shares during the Class Period, so he had no opportunity to profit from the fraud.[15] The other two CFO Defendants, Kulas and Davis, **did** sell shares during the Class Period. On April 28, 2015, the very day that SCUSA released its misstated financials for Q1 15, Kulas exercised options to purchase and then immediately sold 187,190 shares of SCUSA common stock, netting roughly $2.7 million.[16] The trades comprised 23.6% of Kulas's tradeable holdings at the time, an amount that has been deemed by other courts to raise a strong inference of scienter.[17] *See Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1332 (C.D. Cal. 1996) ("[t]wenty percent of a corporate insider's shares, especially where the dollar amounts are high, may constitute a 'suspicious amount' sufficient to support a scienter allegation"). Davis owned only a small number of tradeable SCUSA securities during the Class Period, but of the exercisable options and vested RSUs that she possessed, she appears to have sold all or nearly all of them.[18] This included an exercise of options to purchase and the immediate sale of 31,731 shares of SCUSA common stock on August 4, 2015, netting Davis approximately $450,000.[19] At a minimum, these trades show that the incentives for Kulas and Davis were aligned with the incentives for Dundon, as each one profited from the overstatements

---

[15] Dawood's only Form 4 during the Class Period indicates he received restricted stock units (RSUs) on December 16, 2015 that did not vest until after the Class Period was over. *See* Pl. App., Ex. L.

[16] *See* Pl. App., Exs. N, T.

[17] This calculation excludes RSUs that were not tradeable at the time. *See* Pl. App., Exs. Q, R, U. Defendants may argue that Kulas's trades were not suspicious because they were made pursuant to a Rule 10b5-1 plan. *See* Pl. App., Ex. N. A Rule 10b5-1 plan, however, does not rebut an inference of scienter at the pleading stage, because "the existence of such a plan is an affirmative defense, which requires evidence of the plan itself and of details such as the date the plan was entered into and whether it wholly removed trades from the defendant's discretion." *ArthroCare*, 726 F. Supp. 2d at 722.

[18] *See* Pl. App., Exs. I-K, S.

[19] *See* Pl. App., Exs. J, S. These trades were made pursuant to a Rule 10b5-1 trading plan. *Id.*

in SCUSA's net income for Q4 14 and Q1 15.[20]

### 2. The Facts And Circumstances Of The Restatements Support Scienter

While a financial restatement does not always establish a *strong* inference of scienter, it does, at a minimum, "provide *some* basis to infer scienter." *Cent. Laborers'*, 497 F.3d at 552.[21] "[W]hen the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter." *In re Triton Energy Ltd. Sec. Litig.*, 2001 WL 872019, at *11 (E.D. Tex. Mar. 30, 2001).[22]

### (a) The Magnitude, Timing, And Pattern Of SCUSA's Restatements Support A Strong Inference Of Scienter

The magnitude of SCUSA's restatements is most clearly evident in the concentration of overstatements in two consecutive quarters, Q4 14 and Q1 15. Defendants admit that net income was overstated by $94.3 million, or **61.8%**, in Q4 14, and by $46.8 million, or **19.3%**, in Q1 15. ¶¶41, 50. In the aggregate, for the six months ending March 30, 2015, SCUSA's net income was overstated by more than $140 million, or **35.7%**. ¶¶40-41, 50-52. The size of these misstatements supports a strong inference of scienter. *See, e.g., Patel v. Axesstel*, 2015 WL 631525, at *12 (S.D. Cal. Feb. 13, 2015) (premature recognition of revenue comprising 22% of Q4 2012 and 40% of Q1 2013 revenues was "not minor or technical in nature" and contributed to strong inference of scienter); *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *56 (M.D. Tenn.

---

[20] Defendants' argument that Plaintiffs' motive allegations require Dundon to have predicted the effects of the "legacy accounting methodology" years in advance is inconsistent with the facts of the restatement, as discussed *infra* at 17-18.

[21] *Accord Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006) ("restatement, although not dispositive, adds weight to the scienter calculus").

[22] *See also In re Fleming Companies Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at *37 (E.D. Tex. June 10, 2004) ("A restatement adds significant weight to the scienter calculus due to the magnitude of a restatement, the repetitiveness of GAAP violations requiring the restatement, and the simplicity of the accounting principles that were violated.").

Mar. 31, 2009) (strong inference of scienter where restatement resulted in 3%-5% reductions in net income for 2001, 2002, 2003, and first half of 2005, but resulted in 10% increase in net income for 2004).[23]

The degree to which SCUSA's net income was overstated for the six month period covering Q4 14 and Q1 15 (35.7%) corresponds to the inflation in SCUSA's stock price following the issuance of the misstated results for those quarters. On February 2, 2015, the day before the Class Period began, SCUSA's stock price closed at $18.63. ¶¶34, 112. SCUSA released its results for Q4 14 the next day and its results for Q1 15 on April 28, 2015. ¶¶35, 47. By April 30, 2015, the day after SCUSA filed its Form 10-Q for Q1 15 with the SEC, the stock price closed at $24.69—a 32.5% increase over the price immediately before the issuance of the misstated Q4 14 and Q1 15 results.

Defendants argue that the Restatements nevertheless are not substantial in magnitude, because the results were not uniform: net income was adjusted downwards in certain periods and upwards in others. DB 14. Multiple courts, however, have recognized that a restatement can be significant in magnitude, even if the results do not consistently adjust net income downwards. *See, e.g.*, *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 758, 784-87 (M.D. Tenn. 2013) (magnitude of restatement supported a strong inference of scienter, even though net income was overstated in certain periods and understated in others).[24] This is particularly true in cases with insider trading, which require a fine-tuned

---

[23] These figures are not reported in the court's decision, but were discussed in the motion to dismiss briefing. *See* Defendants' Reply in Support Of Motion to Dismiss at 11-12, *In re Am. Serv. Grp., Inc.*, No. 3:06-CV-00323 (M.D. Tenn. Apr. 27, 2007), ECF No. 78. *See also In re Carter's Inc. Sec. Litig.*, 2012 WL 3715241, at *2, *5 (N.D. Ga. Aug. 28, 2012) (overstatement of accounts receivable ranging from 8.3% to 26.5% over five year period and overstatement of earnings of $3.1 million at end of one year supported strong inference of scienter).

[24] *See also Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009)

analysis of the timing of the misstatements, their effects on the company's stock price, and whether defendants engaged in suspicious trades based on that timing.[25]

Further, the distribution of the overstatements and understatements corrected by the Restatements was not random, but followed a particular pattern. Within 2014 and 2015, net income was understated for four quarters and overstated for four quarters, but three of the overstated quarters were the three consecutive quarters preceding Dundon's departure—Q3 14, Q4 14, and Q1 15. This pattern further strengthens the inference that however non-uniform the results of the Restatements might be, Dundon's exit was timed to maximally leverage those periods in which net income was overstated.[26]

One metric that was affected by the Restatements in a single direction (at least for the periods as to which data was provided) was TDR impairment. SCUSA's reported and restated figures for TDR impairment of retail installment contracts is set forth in the chart below:[27]

---

(magnitude of restatement raised a strong inference scienter notwithstanding the fact that "the accounting errors did not consistently overstate income or understate expenses"); *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *56 (M.D. Tenn. Mar. 31, 2009) (discussed *supra* at 12-13).

[25] Of the three cases cited by Defendants in support of their argument that a non-uniform restatement does not support a strong inference of scienter, none involved stock sales by insiders timed to coincide with an admitted overstatement of net income. *See* DB 14; *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532, 535, 543-44 (5th Cir. 2008) (defendants never restated their financial statements, and court found alleged insider sales were not unusual or suspicious in timing or amount); *Schott v. Nobilis Health Corp.*, 2016 WL 5539756 (S.D. Tex. Sept. 29, 2016) (no allegations of suspicious insider sales); *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *10 (N.D. Ill. July 12, 2006) (same).

[26] Defendants make much of the fact that the Restatements caused net income to be adjusted upwards for 2011-2013. Those years are well before the Class Period and thus of minimal, if any, importance. Moreover, the periods before and after SCUSA's IPO (which took place on January 23, 2014) were affected very differently by the tangle of errors giving rise to the Restatements. The Restatements corrected only ***understatements*** of net income for each of 2011, 2012, and 2013 and ***net overstatements*** of net income for each of 2014 and 2015. This distribution is suspicious, particularly in light of the timing of Dundon's departure and the ad hoc nature of the accounting errors. *See infra* at 17-18.

[27] *See* Pl. App., Ex. A. This chart only includes figures for 2014 and 2015, because those are the only years for which SCUSA disclosed restated TDR impairments.

| Quarter | TDR Impairment Of Retail Installment Contracts (in thousands of dollars) | | |
|---------|----------------------|---------------------|----------------------|
|         | As Originally Reported | As Restated – 3/31/16 | As Restated – 10/27/16 |
| Q1 14   | 498,811              | 769,327             | N/A                  |
| Q2 14   | 551,767              | 875,879             | N/A                  |
| Q3 14   | 605,643              | 1,016,114           | N/A                  |
| Q4 14   | 797,240              | 1,159,827           | 1,172,149            |
| Q1 15   | 878,278              | 1,273,051           | 1,285,957            |
| Q2 15   | 967,994              | 1,384,649           | 1,392,917            |
| Q3 15   | 1,402,215            | 1,323,416           | 1,330,401            |
| Q4 15   | 1,356,092            | 1,356,092           | 1,363,023            |

As indicated in this chart, SCUSA's TDR impairment was both steadily increasing and *consistently understated in each of the six quarters between Q1 14 and Q2 15*. The pervasiveness and consistent directionality of this accounting error over a sustained period of time further strengthens the inference of scienter. *See, e.g.*, *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at \*5 (D. Ariz. Aug. 9, 2010) ("where ... [an accounting] mistake is pervasive over a long period of time, the inference of scienter may be much stronger").[28]

TDR impairment remained understated until Q3 15, the first quarter following Dundon's departure. In that quarter, SCUSA recognized $1.4 billion in TDR impairment, a dramatic 45% increase from the $968 million recognized in Q2 15. The SEC saw this sudden spike in TDR impairment as a red flag and opened a review into SCUSA's TDR disclosures, which is still ongoing.[29] In reality, the restated numbers show that TDR impairment did not increase in Q3 15, but actually decreased. The sudden jump in Q3 15, however, acted to "correct" SCUSA's TDR impairment to a level much closer to its actual value.[30] The timing of that correction supports the

---

[28] *Accord Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016) (same).

[29] *See supra* at 4 (discussing the open comment letter received by SCUSA from the SEC's Division of Corporate Finance); Pl. App., Ex. G (Form 10-K filed on February 28, 2017) (indicating open comment letter is still unresolved).

[30] For each of the six quarters between Q1 14 and Q2 15, TDR impairment was understated by

inference that whatever accounting practices were causing an under-identification of TDR loans and an under-recognition of TDR impairment prior to Dundon's departure suddenly changed in the very next quarter after he left. *See, e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]he fact that the new CEO ... discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly.").[31]

**(b)     The Nature Of The Accounting Errors And Defendants' Restatement Disclosures Indicate Scienter**

Other factors may strengthen the inference of scienter arising from a restatement, including the nature of the accounting errors, the relative simplicity of the accounting principles involved, whether defendants violated their own accounting policies, and the completeness of defendants' disclosures concerning its accounting treatment. *See, e.g.*, *ArthroCare*, 726 F. Supp. 2d at 722 ("the relative simplicity of the issues" that led to a restatement "significantly contribute[d] to a finding of scienter"); *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 234 (D. Mass. 1999) (a company's violation of its own accounting policies or its "omission in public statements of material facts related to the GAAP violations" support an inference of scienter).[32]

Defendants identified three basic categories of errors underlying the restatements: (i) the application of an improper discount rate in determining TDR impairment, (ii) the use of an improper methodology for the accretion of discounts, and (iii) a misidentification of the loans

---

an amount ranging from 44% - 68%. For Q3 15, TDR impairment was overstated by 5%.

[31] *See also George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *14 (S.D.N.Y. Aug. 8, 2012) ("[Q]uick discovery of an alleged error in the defendant-company's financial statements" "support[s] an inference of recklessness.").

[32] *See also Medicis*, 2010 WL 3154863, at *5 (finding strong inference of scienter where "the accounting violation was not particularly great in magnitude, but where the relevant violation was relatively straightforward or obvious"); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 971 (S.D. Ind. 2007) (a company's violation of its own accounting policies supports an inference of scienter).

16

classified as TDRs, leading to an under-identification of TDRs and errors in calculating TDR impairment. ¶76. The first two categories of error (discount rate and accretion methodology) relate to straightforward, prescriptive GAAP rules (¶¶32-33), and therefore support a strong inference of scienter. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious"); *Fleming*, 2004 WL 5278716, at *37.

It is the third category of error, however, that is perhaps most indicative of scienter. Defendants have never provided a clear explanation of how or why TDRs were misidentified, but merely said that the Company's review controls "did not effectively identify that ***parameters used to query the loan data were incorrect***."[33] Defendants did not identify which incorrect "parameters" were used to classify TDRs, but did acknowledge that these errors demonstrated a material weakness in SCUSA's control environment relating to a failure to "***implement[] certain accounting practices to conform to the Company's policies*** and GAAP."[34] In other words, Defendants admitted that the application of the incorrect (unidentified) parameters was not only a violation of GAAP, but also a violation of SCUSA's own accounting policies.

These disclosures shed light on SCUSA's so-called "legacy accounting methodology" that Defendants repeatedly reference in their motion to dismiss. DB 2, 8, 15, 20. Defendants argue that SCUSA's "legacy accounting methodology," which purportedly was put into place years before SCUSA's, while incorrect, was consistently applied from 2011 through 2015.[35] But

---

[33] Def. Ex. I at App. 142. Defendants also disclosed that the Company's review controls over inputs used to estimate TDR impairment did not operate effectively. *Id.* Specifically, the Company stated that "[a] review of inputs used to estimate the expected and present value of cash flows of loans modified in TDRs did not identify ***errors in types of cash flows included and in the assumed timing and amounts of defaults*** …." *Id.*

[34] *Id.*

[35] *Id.* at 15, 20-21.

Defendants have never explained their "legacy accounting methodology" with respect to TDR identification, including which "parameters" were used to under-identify TDRs, how those parameters deviated from GAAP and the Company's own accounting policies, and whether those parameters were applied consistently during the years covered by the restatements.

The TDR impairment data discussed *supra* at 15-16 provides substantial circumstantial evidence that SCUSA's accounting practices for TDR identification and impairment were not consistent between the six quarters before Dundon's departure and the quarter that immediately followed.[36] During the six quarters from Q1 14 to Q2 15, TDR impairment was consistently understated (in a range from 44% to 68%). After Dundon left, TDR impairment "caught up" with its real value and became overstated by 5%. This supports the inference that the TDR-suppressing parameters applied during the Dundon era promptly changed once he left.

The foregoing reveals the artificial construct underlying Defendants' strawman argument about Plaintiffs' motive allegations. Defendants argue that Plaintiffs' theory requires the assumption that Dundon put the legacy accounting methodology into place years in advance with the foresight to predict that the methodology would understate net income in certain periods and overstate net income in others so that he could later time his exit to take advantage of the overstatements. DB 20-21. But Plaintiffs' theory requires no such assumption. Instead, it is Defendants' theory that is based on the false assumption that SCUSA's "legacy accounting methodology" was one consistent set of accounting rules, rather than a shifting collection of practices that allowed ad hoc manipulation of key inputs, like which loans constituted TDRs.[37]

---

[36] Because Defendants have not provided any restated TDR impairment figures for 2011 – 2013, it is impossible to determine if TDR impairment was overstated or understated during any quarter or year within that three-year period.

[37] Defendants argue that the fact Santander's auditor gave unqualified financial statements weighs against an inference of scienter. DB 13. While an auditor's approval of a financial

### 3. Additional Factors Bolster The Already Strong Inference Of Scienter

While the magnitude, timing, pattern and nature of Defendants' accounting errors, coupled with Defendants' motive and opportunity to inflate SCUSA's stock price for personal gain, are themselves sufficient to establish a strong inference of scienter, two additional "plus" factors further strengthen the already strong inference. First, in light of SCUSA's status as a consumer finance company dealing in subprime vehicle loans and other unsecured consumer lending products (*i.e.*, high risk consumer financing), identification of TDRs and calculation of TDR impairment were critically important accounting metrics. As explained in the Complaint, TDR impairment directly impacted the Company's loan loss reserves, which, in turn, directly impacted net income. ¶¶27-28, 30. Accordingly, Defendants knew, or were reckless in not knowing, both (i) SCUSA's accounting practices with respect to TDRs and (ii) that TDR impairment was significantly understated. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (finding strong inference of scienter with respect to company's failure to timely recognize impairment of value of its planes, as required by GAAP, because "acquiring and hiring cargo planes" were "activities that constitute[d] the core operations of [the company]"); *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (finding allegations to be probative of scienter where the alleged misrepresented information was sufficiently important to the health of the company).

Second, in connection with the restatements, Defendants admitted that SCUSA had multiple unreported material weaknesses in its internal control over financial reporting (¶¶73, 75,

---

statement never can insulate a company or its officers from liability for issuing false financial statements, that is particularly true in cases like this one, where Defendants could easily manipulate the query parameters and inputs for TDRs to prevent detection by auditors. *Cf. In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) ("At this stage in the litigation, there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements.").

84, 88, 89), including a material weakness related to a failure to follow the Company's own policies with respect to TDR identification. *See supra* at 17. Defendants, however, were put on notice of deficiencies in SCUSA's internal controls at a much earlier date. As this Court is aware, a parallel securities class action complaint centered on a number of the same Defendants (SCUSA, Dundon, and Kulas) but relating to an earlier class period alleges that SCUSA was notified by the Federal Reserve of "widespread and significant deficiencies" in the SCUSA's internal controls by the Federal Reserve in March 2014.[38] In denying Defendants' motion to dismiss, this Court sustained all of plaintiffs' claims, including Section 10(b) claims concerning Defendants' statements that SCUSA maintained "an extensive compliance, ***internal control***, and monitoring framework."[39] In sustaining those claims, the Court held those statements were materially false and made with scienter.

Defendants' knowledge of SCUSA's longstanding, persistent, and widespread internal control problems further supports a strong inference of scienter. *See, e.g.*, *UTStarcom*, 617 F. Supp. 2d at 975 (inference of scienter was "strengthened by the allegations that Defendants were made aware ... of significant internal control problems," but "despite this awareness Defendants did not implement the proper control measures and continued to report and certify false revenue data"); *Norfolk Cnty.*, 2009 WL 2386156, at *8-*9 & n.5 (N.D. Ill. July 28, 2009) (similar).[40]

### C.     The Complaint Adequately Alleges Loss Causation

Defendants' argument that the Complaint fails to plead loss causation is without merit. DB 22-25. To plead loss causation, the Supreme Court requires only "some indication of the loss

---

[38] *See* First Amended Class Action Complaint at ¶¶110, 112, *Deka Inv. GMBH v. Santander Consumer USA Holdings, Inc.*, No. 3:15-CV-2129 (N.D. Tex. Oct. 30, 2015), ECF No. 104.

[39] *See id.* at ¶¶295-96, 297-98, 302-03; *see also* Order, *Deka Inv. GMBH v. Santander Consumer USA Holdings, Inc.*, No. 3:15-CV-2129 (N.D. Tex. June 13, 2016), ECF No. 128.

[40] *See also Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 17 (D. Mass. 2000) (similar); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (similar).

and the causal connection" to the alleged fraud. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs provide such an indication through allegations of a "corrective disclosure," revealing the "relevant truth" that Defendants concealed, and a stock price drop. *See Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320-21 (5th Cir. 2014). Specifically, Plaintiffs plead a series of partial corrective disclosures culminating in: (1) Defendants' March 15, 2016 disclosure that SCUSA's financial statements filed with the SEC for "prior periods" were materially false; and (2) the resulting 16% drop in the price of the Company's stock at the close of business the next day.

Embedded in Defendants' argument to the contrary are two faulty premises. The first is that this Court must assess each alleged corrective disclosure individually and in isolation from the others. *See* DB 22-25 (mischaracterizing the Complaint's allegations as consisting of only two corrective disclosures, and mistakenly analyzing them in isolation from one another). The Fifth Circuit has specifically rejected this contention. In *Amedisys*, the Fifth Circuit held that a corrective disclosure does not "have to be a single disclosure; rather, the truth can be gradually perceived in the marketplace through a series of partial disclosures." 769 F.3d at 322. Also, a court must conduct a holistic analysis in determining whether a corrective disclosure has been adequately alleged. Id. ("We … review each of the five partial disclosures … against the test for 'relevant truth,' but we consider them collectively in determining whether a corrective disclosure has occurred."). Such a series of partial disclosures, viewed holistically, may create a "whole" corrective disclosure that is "greater than the sum of its parts." *Id.* at 324.

Defendants' second false premise is that each partial disclosure must "reveal[] the falsity of ... previous representations in [the company's] financial statements." DB 22. Yet again, the Fifth Circuit has rejected this argument. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572

F.3d 221, 230 (5th Cir. 2009) (rejecting the argument that "a fraud causes a loss only if the loss follows a corrective statement that specifically reveals the fraud"). Indeed, a corrective disclosure need not be a "mirror image" or "fact-for-fact" disclosure; otherwise "a defendant could defeat liability by refusing to admit the falsity of its prior misstatements" and thus "immunize themselves with a protracted series of partial disclosures." *Id.* As such, "[t]o be corrective, [a] disclosure need not precisely mirror [an] earlier misrepresentation." *Id.*

The Complaint alleges that Defendants gradually revealed the truth to the marketplace through a series of partial disclosures which, when viewed collectively, as required by *Amedisys*, constitute a corrective disclosure. First, the Complaint alleges that the announcement of Dundon's resignation on July 2, 2015 was a partial disclosure, resulting in a $2.19 drop in SCUSA's stock price. ¶¶67-68. Defendants contend that the unexpected, sudden announcement of Dundon's resignation cannot constitute a partial disclosure since "it had nothing to do with [the Company's] financial statements or the alleged accounting errors." DB 23. Defendants are wrong. "While nothing in the resignation announcement alone reveals the truth behind earlier misstatements or provides notice to the Defendants of what the causal connection might be between the relevant economic loss and the misrepresentations ... , this too may constitute a portion of the totality that we must consider." *Amedisys*, 769 F.3d at 322-23.  In *Schott v. Nobilis Health Corp.*, 2016 WL 5539756 (S.D. Tex. Sept. 29, 2016), the court held that allegations concerning "reports of auditor and officer resignations," when taken in conjunction with "a media report speculating about accounting errors regarding Nobilis's equity interest and the sale of warrants and options," were sufficient to support a "facially plausible" inference of loss causation. *Id.* at *13-14.

Even though allegations of Dundon's resignation, standing alone, may not suffice to

establish loss causation, when the Company's unexpected announcement of Dundon's sudden departure is taken in conjunction with speculation from analysts that his resignation "may have indicated an undisclosed issue regarding the financial position of the Company," ¶¶69, 111, such an event "constitute[s] a portion of the totality that [this Court] must consider." *See Amedisys*, 769 F.3d at 322-23. Indeed, SCUSA's subsequent disclosures—including its statements that it had received an open comment letter from the SEC, would be delayed in filing its annual financial report, and ultimately would be restating—served as confirmation of the analysts' speculation in July 2015 that Dundon's resignation signaled an undisclosed financial issue confronting the Company. *See, e.g.*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210-11 (9th Cir. 2016) (complaint adequately pled loss causation based in part on allegation that "the market and various analysts perceived the subpoena to be related to CVB's alleged misstatements about Garrett's ability to repay," which was later confirmed by a subsequent corrective disclosure).[41]

The Complaint alleges that, on February 29, 2016, the Company filed a report advising the SEC that it would be delayed in filing its annual report for the 2015 fiscal year. ¶70. The Company stated that it had an open comment letter from the SEC with respect to "the Company's credit loss allowance, including the removal of seasonality and the increase in [TDR] impairment during the quarter ended September 30, 2015 as well as certain TDR disclosures in both [FY 14 and Q3 15]." ¶70. Defendants do not argue that SCUSA's February 29, 2016 filing did not constitute a partial disclosure, *see* DB 24-25, and for good reason. By disclosing in late February 2016 the existence of these open accounting issues with the SEC, Defendants presaged their subsequent disclosure of the Company's widespread accounting errors. *See* ¶¶72-77.

---

[41] *Lloyd* is instructive, because the Ninth Circuit explicitly relied on *Amedisys* in framing its loss causation analysis, and held that a plaintiff may plead loss causation even if there is no negative stock price reaction following a confirmatory corrective disclosure. *See id.* at __.

The Complaint further alleges that, on March 15, 2016, the Company filed a Form 8-K with the SEC stating that it would be "changing its methodology for estimating credit loss allowance on individually acquired retail installment contracts" and would "correct prior periods in Item 9B in the Form 10-K." ¶71. Defendants thus admitted that the Company's financial reports filed with the SEC contained materially false statements as to its income. Defendants contend that this disclosure was insufficiently specific to be a corrective disclosure, arguing that the March 15, 2016 Form 8-K "did not disclose the income overstatements until it filed its 2015 Form 10-K two weeks later." DB 25. Defendants are wrong. In *Flowserve*, the Fifth Circuit rejected a nearly identical argument. The *Flowserve* defendants argued, and the district court held, that the alleged corrective disclosure "had directly to reveal that the October 2001 guidance was fraudulent." On appeal the Fifth Circuit reversed, holding that such an allegation was "not required," and that "it was enough that the market learned that the October 2001 guidance was wrong and that other negative information unrelated to the reduced FY2002 guidance did not cause the decline in Flowserve's share price." 572 F.3d at 231. Similarly here, Defendants' March 15, 2016 Form 8-K advised the market that their prior financial statements with respect to the Company's income were wrong. Defendants do not contend that some "negative information unrelated to" the March 15, 2016 Form 8-K caused the subsequent drop in the Company's stock price by the market's close the next day. Therefore, the Complaint's allegations are sufficient under *Flowserve*, and Defendants' contention that more was required is at odds with Fifth Circuit precedent and must be rejected.

Finally, Defendants argue that notwithstanding the negative price reactions to the partial corrective disclosures, loss causation has not been pled because SCUSA's stock price increased following its issuance of its first set of restatements on March 31, 2016. *See* DB 25. That

argument, however, ignores the holistic analysis required by *Amedisys*. By the time the 2015 Form 10-K had been filed, SCUSA's stock price had already been driven down by multiple partial disclosures, including but not limited to July 2, 2015 announcement of Dundon's resignation and the March 15, 2016 announcement that a restatement was forthcoming. The aggregate effect of the drops following those two disclosures ($2.19 and $1.70) was more than double the increase that followed the issuance of the 2015 Form 10-K ($1.59). More broadly, from the Class Period high of $26.83 on June 22, 2015 (the price at which Dundon agreed to cash out his position), SCUSA's stock price had dropped all the way down to $8.90 by March 30, 2015, a decline of 67%. The fact that the March 31, 2016 restatements resulted in a moderate boost to the stock price (back to $10.49) does not come close to compensating investors for the massive losses caused by Defendants' fraud. *See, e.g.*, *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 710-11 (S.D. Tex. 2006) (the fact that stock price increased after restatement did not negate loss causation, because truth began to "leak out" due to earlier partial disclosures).[42]

## IV.    CONCLUSION[43]

For the foregoing reasons, the Court should deny Defendants' motion. Alternatively, if the Court grants any part of the motion, Plaintiffs request leave to amend. *See United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004).

---

[42] *See also In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (loss causation pled where stock price increased following restatement, because by the time of restatement, "the market had already incorporated that the previously released financial statements could not be relied upon"); *UTStarcom*, 617 F. Supp. 2d at 977-78 (similar); *Richard v. Northwest Pipe Co.*, 2011 WL 3813073, at *2-3 (W.D. Wash. Aug. 26, 2011) (similar).

[43] Defendants' only argument with respect to Plaintiff's Section 20(a) control person claims is that the Complaint has failed to plead a primary violation under Section 10(b). *See* DB 25. As discussed throughout this brief, however, the Complaint has adequately pled its Section 10(b) claims. Accordingly, there is no basis for dismissal of the Section 20(a) claims.

Dated:  April 25, 2017                  Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**


By:  _s/ Jason L. Krajcer_
Lionel Z. Glancy
Kara M. Wolke
Jason L. Krajcer
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

**THE ROSEN LAW FIRM, P.A.**
Jacob Goldberg
Keith R. Lorenze
TX Bar #24046313 / SDTX Bar #621638
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
klorenze@rosenlegal.com

Laurence Rosen
Philip Kim
275 Madison Avenue, 34th Floor
New York, NY  10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

**THE BRISCOE LAW FIRM, PLLC**
Willie Briscoe
8150 N. Central Expressway, Suite 1575
Dallas, Texas  75206
Telephone: (214) 239-4568
Facsimile: (281) 254-7789

***Attorneys for Plaintiffs and the Class***

26

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On April 25, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Texas, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 25, 2017, at Los Angeles, California.


*s/ Jason L. Krajcer*
Jason L. Krajcer

# Mailing Information for a Case 3:16-cv-00783-K Parmelee v. Santander Consumer USA Holdings Inc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David B Anders**
  dbanders@wlrk.com

- **Corey Jared Banks**
  cjbanks@wlrk.com

- **R Thaddeus Behrens**
  thad.behrens@haynesboone.com,kimberly.dean@haynesboone.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com,bthompson@thebriscoelawfirm.com

- **Nathaniel Desmons Cullerton**
  ndcullerton@wlrk.com

- **Stephen R DiPrima**
  srdiprima@wlrk.com

- **Caitlin A Donovan**
  cadonovan@wlrk.com

- **Lionel Z Glancy**
  lglancy@glancylaw.com,dmacdiarmid@glancylaw.com,mmgoldberg@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Daniel H Gold**
  daniel.gold@haynesboone.com,elaine.hadaway@haynesboone.com

- **R Dean Gresham**
  dean@stecklerlaw.com,tonja@stecklerlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,disaacson@pomlaw.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Jason L Krajcer**
  JKrajcer@glancylaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,lfportnoy@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Keith Lorenze**
  klorenze@rosenlegal.com,etexidor@rosenlegal.com

- **Matthew Adams McGee**
  matt.mcgee@haynesboone.com

- **Courtney Barksdale Perez**
  cperez@carterscholer.com,chopkins@carterscholer.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com

- **Laurence Rosen**

lrosen@rosenlegal.com,awilliams@rosenlegal.com

- **Kara M Wolke**
  kwolke@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`